Filed 11/13/25

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D082909 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. SCD289932) |
| LEON DANIEL MCINNIS, | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of San Diego County, Jeffrey F. Fraser, Judge. Reversed and remanded with instructions.

Summer Stephan, District Attorney, Linh Lam, Chief Deputy District Attorney, Valerie Ryan, Assistant Chief Deputy District Attorney, Kimberly Roth and Adriana Ross, Deputy District Attorneys, for Plaintiff and Appellant.

Mark Alan Hart, under appointment by the Court of Appeal, for Defendant and Respondent.

INTRODUCTION

In 1994, Karl Senser was fatally stabbed five times in the chest. Law enforcement amassed very strong circumstantial evidence that Leon Daniel

McInnis and his friend, Steven Thomas, together, murdered Senser during a carjacking, kidnapping, and robbery. Although the People successfully prosecuted Thomas in 1996, they did not believe they had enough evidence, then, to successfully convict McInnis of murder.

In 2018, the People decided to take a fresh look at the case in search of Thomas's accomplice. They conducted DNA testing for the first time on items that had been collected during the original investigation, and they found McInnis's DNA on a napkin that had been wrapped around a knife left at the crime scene and on the front passenger seat cover inside Senser's car. They conducted further testing, in part to exclude other suspects, including a man Thomas originally told police had stabbed Senser. Based on this new evidence, the People charged McInnis with Senser's murder in 2021, 27 years after he was killed.

In 2023, McInnis filed a motion to dismiss the murder case on state due process grounds. He asserted the People were negligent in delaying prosecution for so long. He claimed his ability to defend against the charge was prejudicially impaired by the 27-year delay in filing the complaint, because one witness to the carjacking that preceded the murder had died and another witness to the carjacking had no recollection of the events.

The People responded they refrained from filing a murder charge against McInnis in 1994, because they did not believe they had sufficient evidence to persuade a jury beyond a reasonable doubt to convict him. They charged him, in 2021, once they obtained DNA evidence placing McInnis at the crime scene and inside Senser's car and were completely satisfied they had the evidence they needed to obtain a murder conviction. The delay, they argued, was justified "investigatory delay," entitled to strong weight in the balancing of justification against prejudice to McInnis.

Calling the murder investigation an "investigatory failure," the trial court ruled the delay was negligent because the People "could have" fruitfully tested the napkin for DNA in 1994 and dismissed the evidence of McInnis's DNA on the car seat cover as "minimal[ly] probative." The court criticized the People for failing to prosecute McInnis in 1994 because, in its view, there was then "strong circumstantial evidence" showing he participated in Senser's murder. The court dismissed the entire case and released McInnis from custody.

Under controlling California Supreme Court authorities, the trial court's ruling cannot stand. In determining whether there is a due process violation from precharging delay, courts may not find negligence by "second-guessing" (1) "the prosecution's decision regarding whether sufficient evidence exists to warrant bringing charges," (2) "how law enforcement agencies could have investigated a given case," nor (3) "how the state allocates its resources" during a criminal investigation. (*People v. Nelson* (2008) 43 Cal.4th 1242, 1256 (*Nelson*).) Constitutional principles of separation of powers and important public policy considerations underpin these rules. In our justice system, a prosecutor may not ethically charge a defendant with a crime unless completely satisfied the People can promptly establish guilt beyond a reasonable doubt. And the judicial branch is required by our constitution to give deference to that executive decision of when criminal charges should be filed. (Cal. Const., art. III, § 3.)

For these important reasons, our high court has consistently held the People's need for additional investigation to obtain sufficient evidence to charge a defendant is not negligence and provides a "strong" justification for precharging delay, not the de minimis weight the trial court assigned. (*Nelson*, *supra*, 43 Cal.4th at p. 1256; *People v. Cowan* (2010) 50 Cal.4th 401

3

(*Cowan*); *People v. Bracamontes* (2022) 12 Cal.5th 977 (*Bracamontes*).) We thus reverse and remand the matter to the trial court with instructions to reopen the evidentiary hearing, and reconsider whether pretrial dismissal is appropriate after properly balancing the harm to McInnis against the People's strong justification for the delay and considering possible alternative remedies to mitigate the prejudice.

## BACKGROUND

### I.

### *Senser Murder*

Senser was carjacked and killed on May 8, 1994, at the end of a four-day crime spree in which J. Johnston was robbed and carjacked at knifepoint and H. Nguyen's car was stolen.[1]

A.  *Johnston Carjacking*

On Thursday, May 5, 1994, Johnston, a student at San Diego State University (SDSU), drove his red and gray Honda CRX to a house party. It was about 11:00 p.m. He parked, got out of the car, and was about to ring the doorbell when two Black men in their mid-twenties came up behind him and said, "This is a robbery." One of the men had a knife. The man with the

---

[1]    Our summary of the relevant facts is derived from the clerk's transcript, the preliminary hearing transcript, the reporter's transcript from the evidentiary hearing on McInnis's motion to dismiss, and more than 1,000 pages of discovery produced to McInnis by the San Diego County District Attorney's Office (District Attorney's Office). The discovery documents were preserved and retained by the prosecution as part of the original Senser murder investigation and were attached to McInnis's motion to dismiss as an exhibit. The discovery includes investigative reports, autopsy reports, interview transcripts, lineup documentation, test results, and crime scene photographs from the original Senser murder investigation from 1994 to 1995.

knife was taller than Johnston, who is five feet 11 inches in height. The other man was shorter.[2] Johnston could feel the knife touching his chest just underneath his ribs. When he gave the two men $5 or $6, which was all he had in his wallet, they said, "Well, we're going to go to an ATM and you're going to get money for us."

The two men took Johnston's keys and walked him back to his car. They forced Johnston to get in and lie down in the back hatchback area. With the shorter man driving, they took him to a nearby ATM. Accompanied by the taller man with the knife, Johnston withdrew $120 from the ATM and gave it to him, along with the receipt to prove it was all the money he had in his account. Back in the car, they made him empty his pockets and took his gold watch. The men let him go, near where he was abducted, and drove off with his car. Johnston did not get a good look at the men because he kept his head down, as instructed, during the encounter.

Two police detectives happened to be taking a break at a coffee shop near the ATM.[3] They saw Johnston withdraw money and hand it to a Black man who had been watching him during the transaction. Suspicious, the detectives followed Johnston and the other man into an alley where Johnston's Honda was parked. After a license plate check came back negative, the detectives followed the car as it left the alley with Johnston. But they abandoned their pursuit a few minutes later when they were diverted by a call to help with a large car fire in the area.

---

[2] Thomas was significantly taller than McInnis.

[3] All law enforcement personnel are from the San Diego Police Department (SDPD) unless noted otherwise.

The next day, Friday, May 6, 1994, detectives located Johnston's stolen car and began following it. At the end of a "short pursuit," the car crashed into a fence in an alley in a residential area. Two suspects got out and fled on foot.

B.  *Nguyen Car Theft*

The Johnston carjacking and robbery was quickly followed by another car theft in the same area. On Saturday, May 7, 1994, Nguyen parked his silver Toyota Tercel near an intersection that is about a five-minute walk from where police had recovered Johnston's Honda CRX. When Nguyen returned to his car, it was missing so he reported it stolen. Police later found his car parked in the Ocean Beach/Point Loma area in a driveway.

C.  *Senser Carjacking and Murder*

Senser's carjacking and murder took place the same night as the Nguyen car theft. Sometime around midnight or shortly after, on Sunday, May 8, 1994, Senser returned from a week-long trip to Borrego Springs with two friends, M. Hawkins and S. Wedell. They had carpooled back together in Senser's red Toyota Celica. They stopped first at Wedell's condominium, which was across the street from where Nguyen's car had been abandoned.

Senser parked close to the entryway and the three got out to help carry Wedell's luggage and groceries up the stairs. While Hawkins and Wedell stayed upstairs, Senser went back to the car to straighten up and rearrange the remaining items in the car so he could take Hawkins home.

At this time, M. Campion happened to be returning from his girlfriend's apartment with his laundry. He saw a red car in front of Wedell's condominium around 1:15 a.m. As Campion was parking his car, he noticed two Black men walking down the street toward him. The lighting was "dim." One of the men was close to six feet tall with a "pretty good build." The other

6

was taller and skinnier.  Campion thought it was unusual for people to be out walking so late, so he "looked at one of them" and "checked him."  He also heard the man who was closest to him say, "This one over here, man."

Campion went inside his apartment to drop off his laundry.  When he returned to his car, Campion noticed the same two Black men he had seen earlier driving away in a small red car.  He thought he might be witnessing a car theft.  The car was "backing over some luggage, and that seemed kind of strange."  The red car passed by Campion at a very slow pace—"no more than two to five miles an hour"—and the two men stared at him.  Campion was able to see them as they drove under a streetlight.  He did not see anyone else in the car.  Once the car was further down the road, it "sped up, peeled off," and "they were gone."  Campion later told a police detective he "believed he could identify the two [B]lack males if he saw them again."

Another witness, R. Arthur, had arrived in the area on a bicycle.  He saw two Black men and one White man standing near a red car.  "[T]he demeanor of the [W]hite man did not give [Arthur] the impression that [he] was scared or in trouble," but he nevertheless "got a bad feeling about them."  Arthur thought one of the Black men was about six feet tall and the other was "a full head taller."  According to Arthur, the area was "very brightly lit by flood lights on the apartment building . . . as well as a street light on the southwest corner."  Arthur told a police detective that while he rode his bicycle, he passed within three feet of the shorter man and "saw his face clearly."  He "looked directly into the [shorter] man's eyes and would be able to recognize him if he saw him again."

Meanwhile, Hawkins and Wedell became concerned when Senser did not return to the condominium after 20 or 30 minutes.  They looked outside

and saw that Hawkins's suitcase and grocery bags were on the sidewalk. Senser and his car were no longer there. Wedell called 911.

When police arrived, Hawkins showed them a small knife she found on the sidewalk near where Senser's car had been that did not belong to her, Senser, or Wedell. The knife was wrapped in a white napkin and secured with a blue rubber band. Hawkins did not know where the knife had come from and told police that no one had brought anything like it on the trip. Hawkins and Wedell called Senser's family and friends, but no one knew where he was.

Police found Senser's car the next morning, at approximately 7:00 a.m. It was parked illegally in a parking lot about two blocks from where Johnston's stolen car had been abandoned two days earlier. Senser's car was locked and the keys were on the roof.

About an hour and a half later, police found Senser dead, his body left on a storm drain in a dead-end alley. Senser had been stabbed five times in the chest. There was a bruise on his left upper arm that was consistent with Senser having been restrained. An autopsy showed no defensive wounds anywhere on his body. On the ground next to him, police found his driver's license, an ATM card, a bundle of clothes, and a bag of groceries.

Police detectives observed debris from a bottlebrush plant on the bottom of Senser's shoes and inside the front of the car on both the driver and passenger side floorboards. The debris appeared to have come from plants near where Senser's body had been discovered. The location of the debris suggested Senser had been standing at some point before he was killed. It also suggested two individuals were present at that time, and they returned to the driver and front passenger seats of the car after Senser was killed.

8

II.

*The State of the Evidence and Charges in 1994*

A.   *Thomas*

Police quickly identified Thomas as the prime suspect for all three car thefts and Senser's murder.  His fingerprints were matched to fingerprints lifted from the inside of Senser's car near the front passenger seat.  His fingerprints were also found inside Nguyen's car on the doorframe below the front passenger window.

As detectives searched for Thomas, they learned that he and McInnis shared the same home address.  When the detectives found the two of them together on May 19, 1994, they arrested Thomas and detained McInnis for questioning.

In a recorded interview, McInnis acknowledged his friendship with Thomas, but denied involvement in any robbery, auto theft, carjacking, kidnapping, or homicide.  He "willingly agreed to allow [detectives] to take samples of his hair and blood, and his fingerprints for comparison to evidence in the case."  At the conclusion of the interview, the detectives determined he was not a suspect in the case.

That same evening, Thomas also agreed to a recorded interview.  After denying involvement in both crimes—and providing a series of changing and conflicting alibis—Thomas confessed to robbing and carjacking Johnston on May 5, 1994, and carjacking Senser on May 8.  Thomas claimed an individual named Paul Boykin assisted him with the two carjackings and was the person who murdered Senser.

B.   *Paul Boykin*

Based on Thomas's interview, detectives began investigating Boykin as a potential suspect.  Their initial investigation was promising.

9

On May 24, 1994, detectives obtained a vial of blood from the San Diego County Sheriff's crime laboratory. The label on the blood sample indicated it had been taken from Boykin two years earlier when he was arrested for a DUI. Detectives gave the blood sample to a criminalist, Aiko Lawson. Lawson compared Boykin's known blood sample to a small bloodstain found on the passenger seat of Senser's car. She reported Boykin's blood type matched that of the bloodstain found in Senser's car, and that this blood type is present in only 2 percent of the Black population.[4]

Two days later, on May 26, 1994, detectives prepared a photographic lineup with Boykin's picture. They showed it to Arthur, one of the two men who saw Senser's carjacking. Arthur identified Boykin immediately, "without hesitation." On the accompanying form, he wrote: "That's the one. I'm positive. He's the one that stood by the [W]hite guy." (Capitalization omitted.) Later that day, at 9:45 p.m., detectives arrested Boykin. But almost immediately, the case against him began to fall apart.

A few hours after Boykin was arrested, Arthur called the police department and spoke to an investigator. He seemed to be under the influence of alcohol. He recounted that he had returned to a friend's home from a night club at approximately 2:30 a.m., on May 27, 1994. After parking his car, he was "sure" he saw the person he had picked out of the photographic lineup. He said the person had been in a white car wearing a red shirt, and he "had a crazy look in his eye." The investigator told Arthur this was impossible, because Boykin was in police custody. Arthur persisted, "if it wasn't the individual he picked out of the photo line-up th[en] it was one of the other individuals in the line[up]."

---

[4]     The record does not specify the control population used.

Boykin agreed to an interview and denied any involvement in the carjackings and murder. After the interview, he allowed investigators to draw a fresh sample of his blood. The same criminalist, Lawson, analyzed it and discovered a colossal error: The new blood sample from Boykin did not match the sample that had been obtained from Boykin's prior DUI case. It also did not match the blood-type of the bloodstain found in Senser's car.

On May 31, 1994, detectives arranged for two live lineups. One included Boykin and the other included Thomas. They presented the lineups to Johnston (the victim of the first carjacking and robbery), the two police detectives who saw Johnston with the carjackers at the ATM, and the two witnesses to Senser's carjacking, Campion and Arthur. No one identified Thomas or Boykin as a perpetrator. Campion *incorrectly* identified fillers in both lineups. Arthur *incorrectly* identified or tentatively identified fillers, too. Notably, Arthur failed to recognize Boykin.

After the live lineups, Boykin was released from custody. The detectives' "[r]eevaluation of the physical evidence and lineup identification eliminated [him] as a suspect."

C.   *McInnis*

After Boykin's release, detectives refocused their search for Thomas's accomplice on McInnis. They began with an interview of the former girlfriends of Thomas and McInnis, T. Jackson and N. Johnson. They interviewed Jackson and Johnson on May 31, 1994, and Johnson again on July 21.

Jackson said she met Thomas when he was released from jail in November 1993. He became " 'kind of a boyfriend' " and moved into her apartment for about two weeks near the beginning of May 1994. Around the same time, McInnis also briefly moved into the apartment, with Johnson,

11

who was his girlfriend at the time. The four lived together in the apartment from May 3 to May 10, 1994.

Jackson's apartment was within walking distance of where Johnston's stolen Honda CRX had crashed into a fence after the police pursuit on May 6, 1994, where Nguyen's car had been stolen on May 7, and where Senser's stolen car had been abandoned May 8.

Thomas and McInnis were always together and did everything together. Both men were "broke." Neither had a job nor owned a car.

One day, while Thomas and McInnis were out together, Jackson saw "a red Honda CRX crashed into the fence just down the alley from her apartment." Later that same day, when Thomas and McInnis returned, Thomas openly "bragged" about stealing a checkbook and gold watch with a name inscribed on it, and McInnis was wearing a suede jacket he had not been wearing when he left. (Johnston reported the gold watch stolen from him had his name inscribed on it, and his brown suede jacket was missing from the car when it was recovered.) Thomas said he got "th[e] items and $150 cash from some SDSU guy that he and [McInnis] had picked up, robbed[,] and dropped off." He said they "took his car[,] too, but [McInnis] had burned out its brakes and crashed it." Jackson " 'put two and two together' " and "guessed" the car Thomas bragged about stealing was the one that she seen had crashed in the alley earlier that morning.

A few days later, on the night Senser was murdered, Thomas and McInnis were in Jackson's apartment at around 11:30 p.m. Jackson saw Thomas take a knife with a four-inch blade from the kitchen and put it in his back pocket. The men left and did not return until 4:00 a.m. When they came back, they had bags of food, some money, and a set of car keys. Jackson heard what sounded like a car engine idling in the alley behind her

12

apartment. The two men went into a back bedroom and closed the door. Jackson heard them "gossipin[g] on the phone about a little red car."

That night, Thomas and McInnis stayed in the apartment only briefly. They left and said they were going to spend the night at the home of Thomas's mother. When they came back again a few hours later, Jackson told them to move out. A few days later, Jackson and Johnson themselves moved to another apartment in the same building.

On May 19, 1994, Thomas and McInnis came over to Jackson's new apartment. Shortly after arriving, Thomas went to the stairs leading to Jackson's previous apartment. From there, he reached up and "tried to get something out of the rain gutter around the roof." When he was unable to find what he was looking for, McInnis went over and seemed to know "right where to go." McInnis reached into the gutter, pulled out a knife, and threw it to the ground. Jackson was certain the knife was the same one Thomas had taken from the kitchen the night Senser was murdered. She had cooked with the knife many times and it had a decorative floral grip. McInnis and Thomas left with the knife. (Detectives suspected the knife was the murder weapon, but it was never recovered.)

Jackson also told detectives that McInnis had called her after Thomas was arrested and asked her to lie and provide an alibi if she was questioned by police. McInnis told her to say that he and Thomas had been at her apartment all night from May 7 to May 8, 1994, "they had gotten drunk and slept on the floor," and "she would not let them go out because they had too much to drink."

After recounting this information, Jackson agreed to conduct a pretext call with McInnis. During the call, McInnis admitted he retrieved a knife from the roof of Jackson's apartment, but he claimed it was a pocketknife, not

13

a large knife of the type used to stab Senser. McInnis did not admit to being involved in Senser's murder or any of the carjackings.

D. *DNA Testing Leads Nowhere*

Three items found in Senser's car had apparent blood stains: a napkin from the backseat, a money order, and the passenger seat cover. In June 1994, detectives conducted DNA testing on the bloodstains and some hairs that had been recovered from Senser's car. The DNA testing led nowhere. None of the bloodstains or hairs were matched to McInnis or Boykin.

E. *Charges Are Brought While the Investigation Continued*

On July 20, 1994, a grand jury indicted Thomas for (1) the Johnston carjacking, kidnapping during a carjacking, kidnapping, and robbery, (2) the Nguyen car theft, and (3) the Senser carjacking, kidnapping, robbery, and murder. The same grand jury indicted McInnis for (1) the Johnston carjacking, kidnapping during a carjacking, and (2) *acting as an accessory after the fact* to Senser's murder, but not the murder itself.[5] McInnis was formally charged with these offenses by amended information on July 25 and arrested on August 3.

Detectives continued to investigate McInnis's potential involvement in Senser's murder. They obtained a second blood sample from Boykin. Criminalist Lawson retested and confirmed the error in her first test results, and that Boykin's blood sample was inconsistent with the blood stain found on the passenger seat of Senser's car.

---

[5] The People had not asked the grand jury to indict McInnis on a murder charge for Senser's death.

Detectives arranged a third live lineup, now with McInnis included.[6] Although Campion had picked fillers in the previous lineups, he still believed he could identify the shorter of the two suspects. He told detectives he "took a good long look" at the suspect and said, "I don't want to tell you, for sure I can remember him but I'm pretty sure I'll remember the guy if I see him again." Campion again identified another filler, saying he had the "same build, same tone of voice, same walk." This was the third person Campion incorrectly identified as one of the perpetrators.[7]

III.

*McInnis Pleads Guilty to the Johnston Carjacking in 1995*

On August 7, 1995, in exchange for a 15-year stipulated prison sentence, McInnis pled guilty to the Johnston carjacking and admitted a serious felony prior conviction. Pursuant to the plea agreement, the trial court dismissed the remaining charges and allegations, including the charge of accessory after the fact to Senser's murder.

At his sentencing hearing, McInnis's counsel made a record in the presence of the prosecutor, David Bost, that (1) the People did not have enough evidence at that point in time to charge McInnis with Senser's murder, and (2) the plea agreement did not preclude the People from charging him if additional evidence came to light. Defense counsel explained: "The co-defendant, Mr. Thomas, is charged with homicide[.] . . . The[ ] [prosecution is] seeking the death penalty on that case. The [People] . . . tried

---

[6]    McInnis was represented by counsel at the live lineup.

[7]    Arthur, the witness who had identified Boykin in a photographic lineup but failed to identify him in a live lineup, did not participate in this third live lineup.

to implicate [Mr. McInnis] in that homicide. To this point, they've been unable to do so. They are not precluded, it's my understanding, by this plea, from future filings against [McInnis], should circumstances warrant it, but at this time, . . . I see nothing that would indicate that any evidence would . . . come to light. [¶] I think all the evidence is out on that case that would bear on [McInnis's] standing as to that homicide." McInnis explicitly acknowledged that his counsel advised him of these circumstances.

A few months later, on October 6, 1995, detectives updated an internal status report on the Senser murder investigation. About McInnis, the report stated: "Although [McInnis] has not been charged with this crime, he remains a viable suspect." A detective later explained the decision to not charge McInnis as follows: "I think that the detectives had done everything they could reasonably do. They interviewed McInnis. They did fingerprints. There was really nothing more to do. There [are] a lot of murder cases where we are pretty sure we know who did it, but just not quite enough to get over the hump."

IV.

*A Jury Convicts Thomas of Murdering Senser in 1996*

In 1996, a jury found Thomas guilty of the Johnston carjacking, kidnapping, and robbery; the Nguyen car theft; and the Senser carjacking, kidnapping, robbery, and murder. The jury declined to impose the death penalty. In March 1996, Thomas was sentenced to life without the possibility of parole. Bost, who handled McInnis's guilty plea to the Johnston carjacking in 1994, was also the prosecutor in Thomas's jury trial.

16

Relevant here, Thomas's counsel conceded Thomas was guilty of first degree murder.[8] He asserted that Thomas had lied about Boykin's involvement and that it was McInnis who had acted as his accomplice. He contended McInnis had stabbed Senser before Thomas "could do anything about it." In response to this contention, Bost told the jury during closing argument he believed there was not enough evidence to prove McInnis was the second perpetrator.

V.

*Developments in DNA Technology in the Next Two Decades, 1996–2017*

For the next two decades, SDPD and the District Attorney's Office conducted no further investigation of Senser's murder. During this period of inactivity, the procedures and technology used for DNA testing advanced, in two relevant ways.

First, it became standard forensic practice to test for "touch DNA."[9] During the initial Senser murder investigation, from 1994 to 1995, touch DNA testing was possible, but uncommon. SDPD only began conducting DNA testing in late 1992. And "[i]n the early stages of DNA testing," the laboratory focused on "obvious, straightforward items for DNA testing" like body fluids and hairs, not touch DNA. The laboratory was also under budget constraints. There were only two DNA analysts and they "were kept constantly busy" with a heavy workload. This meant that "pretty much every biological case, either homicide or sex crime, coming to the lab virtually had

---

[8]    The record on appeal does not include the entire case transcript from Thomas's trial, only selected excerpts.

[9]    Touch DNA, also known as "trace DNA," refers to the DNA left behind when someone touches an object or surface.

to be assessed as to whether there was value to [testing for] DNA." Thus, if someone had asked the forensic laboratory to test an item for touch DNA, the analysts would have done so, but it would have been unusual.

Second, technology was developed that could reliably test samples that contained DNA from more than two sources. In 1994, it was possible to interpret DNA results from samples that contained a *two*-person mixture. But laboratories had very limited ability to accurately determine DNA contributions in a mixed sample with three or more sources. DNA samples at that time were "run" on a single genetic marker test called DQ Alpha. It was a "visual dot blot test." When a sample contained more than two contributors, multiple markers would "light up," leading to a result that was difficult or impossible to decipher. For that reason, "complicated mixtures such as a four-person mixture" were not analyzed.

The development of "the more discriminating" STR (short tandem repeats) systems after 2000 provided some ability to analyze samples with complicated mixtures by hand, but it was "the development of powerful computers" and "expert systems such as STRmix" software in 2015 that enabled forensic biologists to "readily analyze three- and even four-person mixtures." As explained by the founder of SDPD's DNA laboratory, Patrick O'Donnell, "[w]hat STRmix does . . . is beyond human comprehension." "[I]t takes the data set, and it says 'I'm going to create thousands of permutations in terms of contributors, and I'm going to add these permutations to each other, and I'm going to do this calculation . . . thousands and thousands of times,' and I'm going to let this program run, in some cases, for 18 or 24 hours on a very sophisticated computer. And at the end of that run, it will print out . . . the answer for what it feels is the best contributions." In

O'Donnell's words, this was "something way beyond what [the human mind] could do."

M-Vac machines were also developed during this time, in 2008. They first became available for purchase by forensic laboratories sometime between 2014 and 2015. However, defense and prosecution experts agreed this development was not a significant one for the items collected from the scene of the Senser murder.[10] An M-Vac is "essentially a small sterile vacuum that collects DNA from an object and deposits the DNA onto a circular filter that can then be examined just like a swab." The experts agreed that in most cases, including this one, laboratory technicians can accomplish most of what an M-Vac machine does "by simply doing a very thorough swabbing of whatever it is [they] wish to test."

In addition to the technological advancements, another important event occurred during this period. Lawson, the criminalist, was fired by SDPD for embezzling nearly $20,000. An internal investigation concluded she had removed and embezzled money from the SDPD property room in eight different cases. She claimed the money was being checked out for forensic examination or to be brought to court. And she gave false testimony in court, claiming she had conducted testing on the items of evidence she had checked out when she had not in fact done so. Lawson had extensive involvement collecting and documenting evidence in the Senser case. As noted, she

_____

[10]   As we later discuss, when the People reopened the case in May 2018, District Attorney Investigator (DAI) Anthony Johnson led the renewed investigation. Although it was Johnson's opinion that M-Vacs were an important development for the renewed investigation, we note he was not the People's expert on the state of technology in 1994.

19

performed the test that incorrectly matched Boykin's blood-type to a bloodstain on the passenger seat of Senser's car.

Meanwhile, McInnis served his 15-year prison term for the Johnston carjacking. He was released in June 2006. In May 2010, he was successfully discharged from parole. He moved to Michigan, married, and started a family.

VI.

*Renewed Investigation, 2018–2021*

Over the years, Bost, the prosecutor who tried Thomas for Senser's murder, had always been troubled by the failure to bring Thomas's accomplice to justice. He kept "a blue book with a floral cover" on display in his office that had photographs and information about Senser. The book was given to him by members of Senser's family. In May 2018, shortly before he retired, Bost persuaded DAI Johnson, a member of the SDPD Cold Case Homicide Team, to reopen the case. He told Johnson the case "was always something that had stayed with him." He had previously tried to get the SDPD Cold Case team "to look at the case, but . . . they had too many other cases" to take it.

Bost told DAI Johnson there were several suspects, including McInnis, who was the "prime suspect," and Boykin. The renewed investigation "took place in several 'rounds' over approximately three years." According to Johnson, the length of time was due to limited funding and other resources.

In the city of San Diego, there are "1,000 unsolved murders going back to the early '70s" and the cold case team has only two detectives. This is because SDPD dedicates the "vast majority" of resources to ongoing cases as a matter of policy. As explained by O'Donnell, the former head of SDPD's DNA laboratory, "[i]f you have the choice between analyzing a 20-year-old homicide

20

or a shooting that occurred a week ago that the media's asking about, and you don't have an answer, you know, there's natural pressure that builds toward prioritizing the current case over the historical case." "[I]t was hard for a cold case to get priority" on the weekly list of the top five priorities maintained by SDPD. Consistent with this allocation of resources, DNA testing in a cold case must be pre-authorized by the deputy district attorney assigned to the case and the division chief. Cold cases are ranked "from 1 to 5 with 1 being very good and 5 meaning basically nothing there." It takes "special consideration or a new, interesting development" for permission to place a cold case on the priority testing list.

DNA testing also typically involves "a lot of waiting [and] downtime, because the lab[oratories] take a long time to do the work." The SDPD forensics laboratory has a significant backlog. It receives about 2,500 requests for DNA testing per year and can only process between 1,700 and 1,800 of them. DNA testing is also expensive. In the Senser murder case, the total cost of outside laboratory tests was between $7,000 and $10,000.

To increase the likelihood of authorization and funding, DAI Johnson submitted his requests for DNA testing in batches, starting with what he believed were the most promising items of evidence. Johnson explained that once the cold case team obtains initial testing results that lead to a suspect, "the more it looks like [they] have a path to success [and] the more likely it is that [they] are going to get additional funding."

As part of the first round of tests, DAI Johnson reviewed the case file and identified items for touch DNA testing against samples from McInnis

and Boykin. He submitted the first batch of four items to SDPD's forensic laboratory on August 1, 2018.[11]

The items DAI Johnson identified for the first batch included the napkin that was wrapped around the knife found by Hawkins on the sidewalk after Senser's car disappeared. The knife and napkin, however, had been retained by the superior court as an exhibit in Thomas's trial. Johnson obtained a court order releasing the items in September 2018 and transported them to the laboratory for testing in October.

In November 2018, the laboratory reported the first round of test results to DAI Johnson. Testing revealed a mixture of two DNA contributors to the DNA on the napkin, "with strong support" to include "McInnis as the major contributor at 93%." (Capitalization omitted.) The laboratory reported it was "9.47 x $10^{18}$ times more likely than not" that McInnis was the major contributor to the mixture. (Italics omitted.) Boykin was excluded as a contributor. Testing of the other items was unsuccessful or unhelpful.

After discussions with the prosecution team, DAI Johnson decided to conduct another round of testing to confirm they were "on the right path," and to "strengthen the case." This was a case where more than 100 items of evidence had been collected. Johnson "wanted to just make sure that [they] had done everything [they] could do to include or exclude McInnis as the offender, which meant a lot more evidence work." The new prosecutor assigned to the case later explained, "we need[ed] to make sure that we[ ] exhausted everything that we could have tested because the very common

---

[11]	The prosecution team learned later that Campion died on August 24, 2018. He was 55 years old.

defense that we get is, why didn't you test this item? Why didn't you test this item?"

DAI Johnson was also aware of a glaring weakness in the credibility of the prosecution's case. Lawson, the disgraced criminologist, had worked extensively on the case. And, as mentioned, she had inaccurately reported a match between Boykin's blood type and that of a bloodstain on the front passenger seat cover in Senser's car. All the DNA testing requested by Johnson sought comparisons to both McInnis's and Boykin's profiles. Boykin was eventually excluded from each of the additional tested items.

In December 2018, DAI Johnson obtained approval and funding to contract with a private company in Carlsbad to use the new M-Vac extraction technology to obtain samples from the driver and passenger seat covers in Senser's car. SDPD did not have this capability in-house. In January 2019, he obtained authority to also test Senser's shirt. The M-Vac process was completed in February 2019. Johnson retrieved the seat covers and Senser's shirt, and he delivered the filters from the M-Vac process to the SDPD forensic laboratory for DNA testing.

In March and April 2019, DAI Johnson arranged for a fingerprint that had been on the knife blade to be compared with a digital fingerprint database. The fingerprint was a match to the patrolman who had collected the knife from the crime scene in 1994.

In June 2019, DAI Johnson received test results for the M-Vac filters. The filtration discs obtained from the driver's seat cover contained a mixture of DNA from four individuals. Using STRmix software, the forensic biology unit determined that Senser was the major contributor at 58 percent, and Boykin was excluded. There was "limited support" that McInnis was a 12 percent contributor. The likelihood of his contribution was calculated to be

23

7.83, which means it was 7.83 times more likely he was a contributor than not. The two other minor contributors were unknown.

The M-Vac collection incidentally resulted in the collection of a fairly large number of hairs from Senser's shirt and the car seat covers. The hairs did not have roots, but a professor at the University of California, Santa Cruz, had recently developed a method for deriving a DNA profile from such evidence. DAI Johnson decided to have the hairs tested, and he personally delivered the evidence to the professor for testing in October 2019.

In March 2020, DAI Johnson decided to test several additional items of evidence found in Senser's car, including a wallet, an address book, a briefcase, Senser's driver's license and ATM card, and some miscellaneous documents. The items had been retained by the superior court as exhibits in Thomas's trial. Johnson drafted a court order to have the items released, but the court did not process the order until September 2020 due to the impact of the COVID-19 global pandemic. Johnson collected and delivered the items to the SDPD forensic laboratory in October 2020.

Sometime in the middle of 2020, DAI Johnson also finally obtained test results for the hairs that had been collected from Senser's shirt and the car seat covers from the University of California, Santa Cruz. The examination process did not lead to helpful evidence. It led to only one match, and that was to Senser's friend from the Borrego Springs trip, Hawkins.

During this time, the prosecution team also cooperated with Michigan authorities to set up a *Perkins* operation.[12] The operation took extra time

---

[12] *Illinois v. Perkins* (1990) 496 U.S. 292. A *Perkins* operation typically involves placing an undercover agent in custody with a suspect to obtain more information about the case.

because it was delayed by the COVID-19 global pandemic and conducted out of state. DAI Johnson did not provide details about the operation, but the parties agree it did not lead to admissible evidence.

DAI Johnson acknowledged the pace of the investigation was "slow." But he said this was normal in cold case investigations, because they are "so lab dependent and forensic dependent" and laboratory work takes "a long time. The more evidence there is, sometimes the slower the case goes." According to Johnson, the investigative team would take steps "fairly quickly" whenever they received laboratory results. However, as he explained, they "would do the next step, and then it's hurry up and wait."

VII.

*McInnis Is Charged with Senser's Murder in 2021, and the Case Is Dismissed for Prosecution Delay*

On April 26, 2021, the District Attorney filed a complaint charging McInnis with Senser's murder (Pen. Code,[13] § 187, subd. (a)) and three special circumstances of murder in the commission or attempted commission of carjacking, kidnapping, and robbery (§ 190.2, subd. (a)(17)). The complaint also alleged that McInnis suffered two prior serious felonies (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c)) and two prior strike offenses (§§ 667, subds. (b)–(i), 1170.12, 668). McInnis was arrested and extradited from Michigan to San Diego. He was arraigned on June 18, 2021 and bound over for trial on the special circumstances murder charge after a preliminary hearing on April 27, 2022.

After McInnis was charged with Senser's murder, investigators continued testing additional items of evidence and analyzing the results for

---

[13]    All further undesignated statutory references are to the Penal Code.

25

at least another year, into 2022.  The test results continued to exclude Boykin but provided no further support for the inclusion of McInnis.

In January 2023, McInnis filed a motion to dismiss the case for precharging delay by the prosecution.[14]  The total precharging delay was 27 years.  McInnis asserted he suffered "extreme prejudice" because more than 30 "crucial" witnesses died before he was charged and arraigned.  (Boldface and capitalization omitted.)  The deceased witnesses included Campion, who died on August 24, 2018.  And, although Arthur was still alive, a defense investigator interviewed him and learned he had no recollection of the photographic lineup where he identified Boykin.  McInnis argued the only reasonable remedy was dismissal of the entire case.[15]

---

[14]    McInnis's motion used the term, "pre-accusation delay."  Based on our review of the case law, courts and practitioners have not been consistent or precise in defining and distinguishing between "preaccusation delay" and "precharging delay."  We use "precharging delay," which is the type of delay complained of here, to mean delay between the offense and the time the state first charges a defendant with a crime.  (*Nelson*, *supra*, 43 Cal.4th at p. 1250.)  We use "preaccusation delay" to include both precharging delay and delay that takes place before arrest or the filing of an indictment or information.  (See *People v. Mirenda* (2009) 174 Cal.App.4th 1313, 1328 (*Mirenda*).)  The due process analysis, however, is the same no matter whether the delay is precharging or preaccusation.

[15]    McInnis also claimed he was prejudiced because of the loss of physical evidence that had been stored at the superior court and the case files of his prior defense counsel.  We do not discuss these contentions because McInnis has not renewed them on appeal and the trial court expressly stated that any potential prejudice from the alleged loss of this evidence was not essential to its ruling on McInnis's motion to dismiss.  (The alleged loss of the physical evidence stored in the courthouse was also the subject of a motion to dismiss filed by McInnis for failure to preserve evidence in violation of the due process principles expounded upon in *California v. Trombetta* (1984) 467 U.S.

After a three-day evidentiary hearing, the trial court granted McInnis's motion and dismissed the entire action. But the court found "the death of eyewitness . . . Campion yield[ed] serious prejudice," and "[t]he failing memory of eyewitness . . . Arthur compound[ed] this prejudice." The court rejected the People's claim of justifiable investigative delay and, instead, found that law enforcement acted negligently in the case "for decades."

---

479. The court did not reach this motion and we express no opinion on its merits.)

## DISCUSSION

The People contend the trial court erred when it dismissed the case against McInnis, for two reasons. First, they contend the court failed to correctly apply legal standards that are mandated by separation of powers principles and established by settled California Supreme Court precedent. Relying on *Nelson*, *supra*, 43 Cal.4th 1242, *Cowan*, *supra*, 50 Cal.4th 401, and *Bracamontes*, *supra*, 12 Cal.5th 977, the People assert the court impermissibly second-guessed their "judgment of what investigation and evidence was necessary" for the People to "be completely satisfied [McInnis] should be charged with murder and that guilt could be promptly established beyond a reasonable doubt once charges were filed." Consequently, they argue, the court erred in finding the delay negligent and unjustified.

Second, the People contend the trial court abused its discretion when it dismissed the entire case on the ground there would be irreparable prejudice at trial from "the absence of live, fresh testimony" by Campion and Arthur. They argue McInnis could be provided a fair trial through the presentation of exculpatory evidence "in an alternative form," such as by admitting prior recorded statements or providing the jury with instructions.

We agree with the People's first contention. We accordingly remand the matter to the trial court with instructions to reopen the evidentiary hearing, allow McInnis to present additional evidence on any circumstances that have changed during the pendency of this appeal which may have compounded the prejudice to his defense, and reconsider whether pretrial dismissal is an appropriate remedy after properly balancing the harm to McInnis and the People's justification of investigative delay. Our review is for abuse of discretion. (*Cowan*, *supra*, 50 Cal.4th at p. 431.)

## I.

28

*Governing Legal Principles*

The statute of limitations is generally " 'the primary guarantee against bringing overly stale criminal charges' " and our Legislature has "declin[ed] to impose a statute of limitations for murder, among the most serious of crimes." (*Nelson, supra,* 43 Cal.4th at p. 1250.) The statute of limitations, however, is not the only protection against excessive delay by the People in filing charges. The due process clause of the California Constitution also "safeguards individuals from excessive delay between the commission of a crime and the initiation of criminal proceedings." (*People v. Booth* (2016) 3 Cal.App.5th 1284, 1302 (*Booth*).)

This protection against prejudicial delay in criminal cases is analogous in many ways to the equitable doctrine of laches, which acts as a backstop to the statute of limitations in civil cases. However, as we shall discuss, it differs in criminal cases in one critical respect. Separation of powers principles prohibit the judicial branch from second-guessing certain charging and investigative decisions by the executive branch. As explained by the United States Supreme Court, "[j]udges are not free, in defining 'due process,' to impose on law enforcement officials our 'personal and private notions' of fairness and to 'disregard the limits that bind judges in their judicial function.' " (*United States v. Lovasco* (1977) 431 U.S. 783, 790 (*Lovasco*).)

A. Nelson

The landmark case to address state constitutional protections against unjustified, prejudicial precharging delay is *Nelson, supra,* 43 Cal.4th 1242. In *Nelson*, the California Supreme Court addressed whether a 26-year delay in charging a defendant with murder violated his state and federal due process rights. (*Id.* at p. 1249.) Important here, our high court identified and distinguished three types of reasons for delay by the People in bringing

29

charges to assess whether there has been a due process violation: "[p]urposeful delay," "negligent" delay, and "investigative delay." (*Id.* at pp. 1255–1256.)

*Nelson* involved a murder that went unsolved for a quarter-century. The victim, 19-year-old Ollie George, called her mother in the late afternoon from a parking lot to let her know that her car would not start. (*Nelson, supra,* 43 Cal.4th at pp. 1247–1248.) Around the same time, two witnesses saw the victim's car in the parking lot with the hood up and a man working on the engine. (*Id.* at p. 1248.) The car was later found unattended. It was still parked in the same parking lot where the victim had been last seen. The car was unlocked, and the keys were in the ignition. (*Ibid.*) Two days later, the victim's body was found. She had "been raped and drowned in mud." (*Ibid.*) The crime took place in 1976. (*Id.* at p. 1247.)

The defendant immediately became a suspect because a witness believed he recognized the defendant's car as the one he had seen near the victim's car before she disappeared. (*Nelson, supra,* 43 Cal.4th at p. 1248.) The defendant agreed to an interview and "gave a rather confused account of his whereabouts" at the time of the disappearance. (*Ibid.*) But his mother-in-law provided an alibi and said he was at her house during the hours when the victim had been observed in the parking lot. (*Ibid.*)

Over the course of the investigation, detectives received numerous other leads and talked to over 180 potential witnesses. They were never able to develop sufficient evidence to focus the investigation on a specific person. (*Nelson, supra,* 43 Cal.4th at p. 1248.) So, "the matter became a cold case, that is, unsolved but inactive." (*Ibid.*)

Twenty-four years later, in 2000, California "allocated funds to enable local law enforcement agencies to utilize DNA to solve sexual assault cases

30

that lacked suspects." (*Nelson*, *supra*, 43 Cal.4th at p. 1248.)  The George murder case was put in line for review, behind many other cases.  (*Id.* at pp. 1248–1249.)  In 2001, analysts matched DNA obtained from the defendant with semen found on the victim's sweater and a vaginal swab that had been obtained during her autopsy.  (*Ibid*.)  Based on this new evidence, the defendant was arrested and charged with murder in 2002.  (*Id.* at p. 1249.)

Before trial, the defendant moved unsuccessfully to have the case dismissed for unjustified delay by the prosecution in bringing charges. (*Nelson*, *supra*, 43 Cal.4th at p. 1249.)  He argued his "state and federal constitutional rights to a fair trial and due process were violated because the delay was unjustified and prejudiced his defense." (*Ibid*.)  The prosecution responded that "the delay was justified because it did not have enough evidence to bring charges until the 2002 comparison of the crime scene evidence with defendant's DNA resulted in a match." (*Id.* at pp. 1249–1250.)

The California Supreme Court conducted a detailed review of state and federal decisions addressing precharging delay by the prosecution.  The court confirmed the due process clause of the California Constitution, article I, section 15, protects a defendant from the prejudicial effects of unjustified delay between the commission of a crime and the defendant's arrest and charging.  (*Nelson, supra,* 43 Cal.4th at p. 1250.)  Although the statute of limitations is the primary guarantee against bringing stale criminal charges, this aspect of the right of due process " 'protects a criminal defendant's interest in fair adjudication by preventing unjustified delays that weaken the defense through the dimming of memories, the death or disappearance of witnesses, and the loss or destruction of material physical evidence.' " (*Nelson,* at p. 1250, quoting *People v. Martinez* (2000) 22 Cal.4th 750, 767.)

31

The court also observed that a defendant's precharging due process rights are at least as favorable, if not more so, under the California Constitution as compared to the United States Constitution. (*Nelson,* at p. 1251.) Courts accordingly apply state law in California when assessing these types of claims. (*Ibid.*)

Under California law, courts employ a three-step test to assess whether a criminal defendant's precharging due process rights have been violated. (See *Nelson*, *supra*, 43 Cal.4th at p. 1250.) "A defendant seeking to dismiss a charge on this ground must demonstrate prejudice arising from the delay. The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay." (*People v. Catlin* (2001) 26 Cal.4th 81, 107; accord *Nelson*, at p. 1250.) The ultimate objective of the balancing test is to ascertain "whether the precharging delay tilted the playing field against the defendant in such a way that it prevent[s] him from receiving a fair trial." (*Booth*, *supra*, 3 Cal.App.5th at p. 1303.) The burden of proof is on the defendant. (*People v. Price* (1985) 165 Cal.App.3d 536, 542 (*Price*).)

In *Nelson*, our high court discussed the development of this three-step process, as well as each of the three steps. Significant here, at the second step analysis of the government's justifications of its decisions, the court identified three different types of precharging delay. Again, those types are purposeful delay, negligent delay, and investigative delay. The court also addressed the different constitutional ramifications of each type of delay and the corresponding weight each is to be given in the balancing test. (*Nelson, supra,* 43 Cal.4th at pp. 1250–1256.)

The court confirmed that purposeful delay—meaning delay undertaken to gain a tactical advantage over the defendant—is "totally unjustified" from

32

the standpoint of protecting a defendant's right to a fair trial. (*Nelson, supra,* 43 Cal.4th at p. 1256.) Therefore, when balancing purposeful delay against prejudice to the defendant, "a relatively weak showing of prejudice would suffice to tip the scales towards finding a due process violation." (*Ibid.*)

Turning to negligent delay, the court surveyed relevant case law and held that, in addition to purposeful delay, negligent delay by the government is also a circumstance "in which delay could be found unjustified." (*Nelson, supra,* 43 Cal.4th at pp. 1254, 1255.) The court reasoned " '[t]he requirement of a legitimate reason for . . . prosecutorial delay cannot be met simply by showing an absence of deliberate, purposeful or oppressive police conduct. A "legitimate reason" logically requires something more than the absence of governmental bad faith.' " (*Id.* at p. 1254, quoting *Penney v. Superior Court* (1972) 28 Cal.App.3d 941, 953 (*Penney*).) The court explained that "whether the delay was negligent or purposeful is relevant to the balancing process," and "[i]f the delay was merely negligent, a greater showing of prejudice would be required to establish a due process violation." (*Nelson,* at p. 1256.)

Although our high court provided no clear definition of "negligent delay," it made a point to distinguish it from investigative delay. The court held that the need for additional investigation to obtain sufficient evidence to charge a defendant, i.e., investigative delay, is *not* negligence and provides instead a "strong" justification for precharging delay. (*Nelson, supra,* 43 Cal.4th at p. 1256.) And it observed that prosecutors appropriately refrain from filing charges until they are satisfied that they can prove a defendant's guilt beyond a reasonable doubt. (*Ibid.*)

Applying the three-step test in *Nelson*, the court first assessed the defendant's showing of prejudice.[16] The defendant asserted he was prejudiced by the unavailability of witnesses as well as "loss of memory, missing photographs, lost or destroyed physical evidence (swabs from the autopsy, degraded DNA samples, fingerprints, hair, and tire tracks), loss of alibi evidence, and unavailable facts for pretrial motions." (*Nelson, supra*, 43 Cal.4th at p. 1251.) The court agreed with the trial and appellate courts that the defendant demonstrated "slight" prejudice based on the unavailability of witnesses, but the other claims were "overstated, speculative, or meritless." (*Ibid.*) Nevertheless, the defendant had demonstrated " 'some prejudice sufficient to require the prosecution to justify the pre[charging] delay.' " (*Ibid.*)

By contrast, the court found the prosecution's justification for the delay was strong. The court determined the delay was " 'the result of insufficient evidence to identify [the] defendant as a suspect and the limits of forensic technology.' " (*Nelson, supra*, 43 Cal.4th at p. 1257.) As such, "[t]he delay was investigative delay, nothing else." (*Id.* at p. 1256.) The court explained: "The police may have had some basis to suspect [the] defendant of the crime shortly after it was committed in 1976. But law enforcement agencies did not fully solve th[e] case until 2002, when a comparison of [the] defendant's DNA with the crime scene evidence resulted in a match, i.e., until the cold hit showed that the evidence came from [the] defendant. *Only at that point did the prosecution believe it had sufficient evidence to charge [the] defendant.* A

---

[16] Notably, the *Nelson* court rejected the defendant's suggested rule "that when the delay is as long as it was here, prejudice should simply be presumed, with no need to show specific prejudice." (*Nelson, supra*, 43 Cal.4th at p. 1250.)

court should not second-guess the prosecution's decision regarding whether sufficient evidence exists to warrant bringing charges." (*Ibid.*, italics added.)

Further still, the *Nelson* court rejected the defendant's argument that because the DNA technology used in his case existed years before law enforcement agencies attempted the comparison, "the comparison *could have*, and *should have*, been made sooner than it actually was" and, consequently, the "state's failure to make the comparison until 2002 was negligent." (*Nelson, supra*, 43 Cal.4th at p. 1256, italics added.) In rejecting this argument, the court held "[a] court may not find negligence by second-guessing how the state allocates its resources or how law enforcement agencies could have investigated a given case. . . . It is not enough for a defendant to argue that if the prosecutorial agencies had made his or her case a higher priority or had done things a bit differently they would have solved the case sooner." (*Id.* at pp. 1256–1257.) The court accordingly ruled that, " '[w]ithout question, the justification for the [26-year] delay outweighed [the] defendant's showing of prejudice.' " (*Id.* at p. 1257.)

B.      *Negligent Delay and Investigative Delay Distinguished*

In *Nelson*, our high court was not called upon to expound the precise boundaries between negligent delay and investigative delay. Here, that boundary is at the heart of the dispute. Following *Nelson's* lead, we provide some guidance for discerning the distinction between these two types of delay. The distinction reflects that important principles of separation of powers prohibit courts from second-guessing the prosecution's investigative and charging decisions when ruling on a motion to dismiss for precharging delay.

1.      *Legal and Ethical Duties That Constrain Prosecutorial Charging Discretion*

35

The starting point for determining whether precharging delay is potentially negligent or investigative is the People's assessment of the evidentiary case against the defendant and their judgment as to whether the evidence is sufficient to support criminal charges. The analysis starts here because of the legal obligations and ethical responsibilities that constrain the People's charging discretion.

Prosecutors are prohibited from instituting or continuing to prosecute a charge the prosecutor knows is not supported by probable cause. (Cal. Rules of Prof. Conduct, rule 3.8(a).) In addition, and critical here, "a prosecutor has a duty 'to charge only those offenses she believes she can prove beyond a reasonable doubt.' " (*People v. Lopez* (2020) 9 Cal.5th 254, 276 (*Lopez*). This is so because a prosecutor has "the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice, that guilt is decided upon the basis of sufficient evidence, and that special precautions are taken to prevent . . . the conviction of innocent persons." (Cal. Rules of Prof. Conduct, rule 3.8, com 1.)

The People's broad discretion to determine when to bring charges is founded on important policy considerations. As explained by the United States Supreme Court, "[f]rom the perspective of potential defendants, requiring prosecutions to commence when probable cause is established is undesirable because it would increase the likelihood of unwarranted charges being filed, and would add to the time during which defendants stand accused but untried. These costs are by no means insubstantial since . . . a formal accusation may 'interfere with the defendant's liberty, . . . disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends.' "

36

(*Lovasco*, *supra*, 431 U.S. at p. 791, fn. omitted.)  "From the perspective of law enforcement officials, a requirement of immediate prosecution upon probable cause is equally unacceptable because it could make obtaining proof of guilt beyond a reasonable doubt impossible by causing potentially fruitful sources of information to evaporate before they are fully exploited.  And from the standpoint of the courts, such a requirement is unwise because it would cause scarce resources to be consumed on cases that prove to be insubstantial, or that involve only some of the responsible parties or some of the criminal acts.  Thus, no one's interests would be well served by compelling prosecutors to initiate prosecutions as soon as they are legally entitled to do so."  (*Id.* at pp. 791–792, fns. omitted.)

A prosecutor thus "abides by elementary standards of fair play and decency by refusing to seek indictments until he or she is *completely* satisfied the defendant should be prosecuted and the office of the prosecutor will be able to promptly establish guilt beyond a reasonable doubt."  (*People v. Dunn-Gonzalez*, (1996) 47 Cal.App.4th 899, 914–915, italics added (*Dunn-Gonzalez*).)  The existence of these legal obligations and ethical responsibilities is one reason why investigative delay constitutes strong justification for precharging delay.  (See *Nelson, supra,* 43 Cal.4th at pp. 1252–1256.)  Thus, if the People do not believe they can convince a jury to find guilt beyond a reasonable doubt, then even a lengthy delay to obtain the evidence they need may appropriately be classified as investigative delay and be entitled to strong weight when balanced against prejudice to the defendant caused by the delay.  (See *ibid*.)

But once the People are satisfied that they have sufficient evidence to prove guilt beyond a reasonable doubt, further delay, by definition, is no longer investigative.  This does not mean such delay is necessarily

37

unjustified, negligent or otherwise improper, however. There are "many legitimate reasons the government might delay bringing charges even after it has sufficient evidence to convict." (*Nelson, supra,* 43 Cal.4th at p. 1252.) Common explanations that may justify additional delay after the government has sufficient evidence to file charges include protecting a confidential informant or an undercover agent and allowing for further investigation of the defendant's conspirators or accomplices. (*Lovasco, supra*, 431 U.S. at pp. 796, 797, fn. 19; see *Nelson,* at p. 1256.) Additional delay may also be explained and justified by the difficulty in allocating scarce prosecutorial resources. In *Dunn-Gonzalez,* for example, the court concluded that a 12-month post-investigative delay in filing charges was justified, in part, by "severe budgetary restraints" that caused a single prosecutor to be assigned to prosecute all major fraud cases in an entire county. (*Dunn-Gonzalez, supra,* 47 Cal.App.4th at p. 916; see *id.* at pp. 906, 915.)

*Unexplained* delay after the People are satisfied they have the necessary quantum of evidence, however, is a different story. Once the People believe they have the evidence they need to file charges, undue delay of any amount of time may ripen into negligence if it causes prejudice to the defendant. This is not to say the People are *required* to file charges immediately, or even promptly, as soon as the requisite proof has been developed. They are not. (See generally, *Lovasco, supra*, 431 U.S. at pp. 792–795; *Nelson*, *supra*, 43 Cal.4th at pp. 1252, 1256.) But memories fade, evidence deteriorates, and time marches forward. If the defendant is prejudiced by such delay without good reason, the People face a higher risk of evidentiary sanctions, or even dismissal. This is because such delay will be weighted as weak or no justification at all in the balancing test against prejudice to the defendant.

Also, relevant here, there is no categorical prohibition against prosecutors revisiting a cold case and changing their minds about whether the evidence is sufficient to convince a jury to convict. "[A] decision not to prosecute, based on a good faith evaluation of the evidence, followed later by a good faith re-evaluation of the *same* evidence" will, however, present "minimal justification" for precharging delay. (*Penney, supra,* 28 Cal.App.3d at pp. 953, 954, italics added.) Thus, if the People put a prosecutable case on the " ' "back burner," ' " hoping it will " 'simmer into something more prosecutable,' " they also face a heightened risk of evidentiary sanctions or dismissal if the defendant is prejudiced as a result. (*People v. Pellegrino* (1978) 86 Cal.App.3d 776, 781 (*Pellegrino*).) Again, delay of this kind does not bar prosecution. But it will be given minimal weight in the balancing test against prejudice to the defendant.[17]

*People v. Hartman* (1985) 170 Cal.App.3d 572 (*Hartman*) illustrates how the principles we have discussed, put together, work in practice. The victim in *Hartman* was found dead in his office under circumstances where it was unclear whether he had been killed during a robbery or had died of

---

[17] It is important to note that we are not called upon today to consider circumstances that may constitute negligent delay other than those discussed here. For the most part, our discussion has addressed situations where precharging delay was either negligent or investigative, i.e., one or the other but not some of both. Our analysis does not foreclose the possibility that prosecutors may engage in some type of non-investigative delay that unreasonably risks harm to the defendant's ability to mount a defense while they are still actively trying to solve a case or accumulate sufficient evidence to file charges, i.e., delay that is simultaneously both investigative and negligent. But no one here has asserted this is a hybrid case. The trial court ruled the People were negligent, and the People argue the delay was investigative.

natural causes.  (*Id.* at pp. 574–575.)  His wallet was missing, and police learned that an employee had cashed one of his checks and used one of his credit cards to purchase a watch and airline tickets.  (*Id.* at p. 575.)

Police suspected the employee of murder.  But in February 1976, the deputy coroner who performed the autopsy concluded the cause of death was heart failure, not homicide.  Investigators in the police department disagreed with the coroner's conclusion and they attempted to persuade the district attorney's office to prosecute, but their efforts were unsuccessful.  (*Hartman, supra,* 170 Cal.App.3d at pp. 575–576.)  In September 1976, a prosecutor memorialized his assessment of the evidence in a memorandum and concluded "there was 'no criminal homicide.' "  (*Id.* at p. 576.)

The victim's widow was upset with the prosecutor's decision.  She arranged for the victim's body to be exhumed and hired an independent coroner to conduct a second autopsy.  By the end of 1977, she had two expert opinions that the cause of death was homicide.  (*Hartman, supra,* 170 Cal.App.3d at pp. 576–577.)  She also obtained an expert opinion that the evidence of heart failure was inconclusive.  (*Id.* at p. 577.)  Based on the new evidence, the victim's widow tried unsuccessfully to persuade the district attorney's office to prosecute.  "For the next several years, she was 'constantly' contacting the district attorney's office, coroner's office, and various divisions of the police department," but "[t]he district attorney consistently refused to order a coroner's inquest."  (*Ibid.*)

In May 1982, the victim's widow finally persuaded the Attorney General to conduct a formal inquest.  A coroner's jury heard testimony by the deputy coroner who conducted the first autopsy, the independent coroner who conducted the second autopsy, and the widow's additional experts.  (*Hartman, supra,* 170 Cal.App.3d at p. 577.)  The jury concluded the death

was a homicide and the victim's widow then persuaded the Los Angeles County Board of Supervisors to pass a resolution seeking reopening of the case. (*Ibid*.) In April 1983, "six years after the second autopsy had been performed, *and without the discovery of any new or additional evidence since then*, the district attorney's office filed an information charging [the employee] with one count of murder." (*Ibid.*, italics added.)

The defendant moved to dismiss, claiming his due process rights were violated by "the seven-year delay between [the victim's] death and the filing of the murder charge." (*Hartman, supra,* 170 Cal.App.3d at p. 578.) The trial court denied the motion; the court of appeal reversed. (*Id.* at pp. 578, 583.)

Addressing the justification prong of the three-step test, the People claimed the delay in bringing charges was justified until they had sufficient evidence to prove the homicide beyond a reasonable doubt. (*Hartman, supra,* 170 Cal.App.3d at p. 582.) They asserted they did not charge the employee with murder in 1976, because they "did not have sufficient medical testimony to constitute a prosecutable homicide." (*Ibid*.) They represented it was not until the victim's widow provided them with the results of the second autopsy, that they " 'had a sufficient number of credible expert [witnesses]' " to proceed. (*Ibid*.)

The starting point of the court's analysis in *Hartman* was the People's assessment of the evidentiary case against the employee and whether they believed there was sufficient evidence to support criminal charges. The court began its analysis by acknowledging that precharging delay may be justified by the need for further investigation when the People do not believe they can prove a crime beyond a reasonable doubt. (*Hartman, supra,* 170 Cal.App.3d at pp. 581–582.) The court credited the prosecution's representation that it did not have sufficient evidence to charge the employee in 1976 and that it

was only after the results of the second autopsy, at the end of 1977, that it had enough evidence to proceed.  (*Id.* at p. 582.)  However, the court observed, the complaint was filed in 1983, and the People did not "point to any valid reason for the *subsequent* delay of five and a half years in filing the murder charge."  (*Ibid.*)

The *Hartman* court explained, "while there may have been some justification for delaying the filing of the murder charge until the prosecution could prove the homicide beyond a reasonable doubt, there was no reasonable justification for the district attorney's office to turn its back on the new evidence once it was available at the end of 1977."  (*Hartman, supra,* 170 Cal.App.3d at p. 582.)  The court concluded "the delay by the prosecution, *from the time the new expert testimony became available*, was without any justification whatever."  (*Id.* at p. 583, italics added.)

2.    *Separation of Powers Restrictions on Judicial Review of Investigative Delay*

We next address the separation of powers doctrine that constrains courts from second-guessing prosecutors when the reasons for precharging delay involve investigative and charging decisions.  In *Nelson, supra,* 43 Cal.4th at page 1256, our high court parsed these constraints in detail.  And it is these constraints that govern our review of the trial court's ruling here.

It is "well settled that the prosecuting authorities, exercising executive functions, ordinarily have the sole discretion to determine whom to charge with public offenses and what charges to bring."  (*People v. Birks* (1998) 19 Cal.4th 108, 134 (*Birks*).)  "The prosecution's authority in this regard is founded, among other things, on the principle of separation of powers, and *generally is not subject to supervision by the judicial branch*."  (*Ibid.*, italics added.)  Article III, section 3, of the California Constitution specifically provides that "[t]he powers of state government are legislative, executive, and

judicial," and "[p]ersons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution."

Based on these principles, the judicial branch is required to give deference to the People's decisions concerning their ethical responsibilities when deciding whether to file charges. (*Nelson, supra,* 43 Cal.4th at p. 1256.) It cannot be seriously debated that law enforcement agencies "lack[ ] the means to exhaustively investigate every case that comes to [their] attention." (*Booth*, *supra*, 3 Cal.App.5th at p. 1308.) And "[s]ometimes a crime simply is not solved immediately but must await some break in the case." (*People v. Cordova* (2015) 62 Cal.4th 104, 120.) "These realities explain why the executive branch [also] has broad discretion when it comes to deciding how to allocate scarce investigative resources" and why the judicial branch must give deference to investigative decisions as well. (*Booth,* at p. 1309; see *id.* at pp. 1308–1310.) "The decision when to proceed with a prosecution is exclusively one for the executive branch of government. It can be a complex question and prosecutors have great discretion in deciding when and if to proceed. Simple wisdom and a due regard for the separation of powers doctrine allow for no other rule." (*People v. Boysen* (2007) 165 Cal.App.4th 761, 774 (*Boysen*).)

In accordance with these principles, our state due process clause "does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment." (*Dunn-Gonzalez, supra,* 47 Cal.App.4th. at p. 914.) When assessing the People's justification for precharging delay, our high court in *Nelson* was explicit: courts may *not* find negligence by "second-guessing" (1) "the prosecution's decision regarding whether sufficient evidence exists to warrant bringing charges," (2) "how law enforcement agencies *could have* investigated a given

case," nor (3) "how the state allocates its resources" during a criminal investigation. (*Nelson, supra,* 43 Cal.4th at p. 1256, italics added.) Thus, when bringing a motion for precharging delay, "[i]t is not enough for a defendant to argue that if the prosecutorial agencies had made his or her case a higher priority or had done things a bit differently[,] they would have solved the case sooner." (*Id.* at p. 1257.)

This deference owed by the judicial branch to the People's investigative and charging decisions does not immunize those decisions from *all* scrutiny in the context of a motion to dismiss for precharging delay. The People's assertions about their view of the evidence are not unimpeachable. Nor are they binding on trial courts when they find no evidentiary support in the record. In *Pellegrino, supra,* 86 Cal.App.3d at pages 780–781, for example, the trial court gave no credit to the People's claim they refrained from bringing charges when their investigation was complete because they needed to keep the identity of an undercover agent confidential while they continued investigating the defendant for related charges. The appellate court concluded "the reason for the delay was not investigative needs but the lack of interest of the responsible agencies in prosecuting the defendants on the basis of [the] evidence," and that the People changed their mind only when the defendants were arrested " 'fortuitous[ly]' " on other charges. (*Id.* at p. 781; see also *Boysen, supra,* 165 Cal.App.4th at p. 781 [finding "[t]he district attorney's claims of justification for th[e] delay are unconvincing"].)

*Cowan* exemplifies the application of these mandatory principles of judicial restraint. The victims in *Cowan* were an elderly couple found murdered in their home in September 1984. The husband had been shot and the wife strangled. Their home had been ransacked, with numerous items stolen. (*Cowan, supra,* 50 Cal.4th at pp. 416–417.) Months later, a

44

fingerprint examiner compared latent prints lifted at the crime scene with the defendant's rolled prints but found no match. (*Id.* at p. 418.) In 1987, a latent print from the crime scene was also run through a computerized fingerprint database, but again no match was found. (*Id.* at p. 418, fn. 5.) By early 1985, law enforcement had gathered evidence the defendant possessed numerous items belonging to the murdered couple, including their jewelry, cigarette lighter and identification, and government checks issued in their names. (*Id.* at pp. 419–420.) But the district attorney declined to file charges, telling the investigators "that all of the evidence was circumstantial and that they could not issue a complaint without evidence linking [the] defendant directly to the murders." (*Id.* at p. 428.)

The investigation then "languished" for almost a decade until a patrol officer who had secured the original crime scene was promoted to the rank of robbery/homicide detective and he decided to "reopen" the investigation in 1994. (*Cowan, supra,* 50 Cal.4th at p. 420.) There were no changed circumstances in *Cowan* that triggered the case to be reopened, for example, no new evidence, and no new technological developments. (*Ibid.*) Once the case was reopened, however, a new fingerprint examiner went through *previously collected* evidence and re-compared the latent prints from the crime scene to the rolled prints of the defendant and other suspects. The examiner used no new technology and collected no new fingerprints. (*Ibid.*) This examiner, however, concluded the original examiner made a mistake and that two latent prints from the crime scene did match to the defendant. (*Id.* at pp. 428–429.) Based on this reassessment of the evidence by the new

45

expert, the defendant was charged with murdering the elderly couple later that year.[18] (*Id.* at p. 429.)

The defendant moved to dismiss the murder charges, asserting the precharging delay prejudiced him because his memory and that of crucial witnesses had faded, the original fingerprint examiner who excluded him was presently unable to explain the basis for his conclusion that the defendant's rolled prints did not match the crime scene latent prints, and authorities had lost several items from the victims' home and he could not now test those items for fingerprints. (*Cowan, supra,* 50 Cal.4th at p. 429.)

The defendant argued the prosecution was negligent because it had enough evidence to charge him within a year of the murder but failed to do so. (*Cowan, supra,* 50 Cal.4th at p. 435.) The California Supreme Court expressly rejected this argument. Our high court applied the rule that " '[a] court should not second-guess the prosecution's decision regarding whether

---

[18] The dissent suggests there were changed circumstances because, as it reads *Cowan,* the original fingerprint examiner's competency was called into question *after* he worked on the case of the murdered elderly couple. Based on this assumption, the dissent speculates that questions about the examiner's work are what triggered the detective to reopen the case in 1994. (Dis. opn., *post,* at p. 24.) This reading of *Cowan* is inaccurate. The examiner's competence was questioned *before* he worked on the investigation of the murdered elderly couple. His past work was then reexamined and his future work doublechecked by other examiners until he retired in 1987. (*Cowan, supra,* 50 Cal.4th at pp. 418, fn. 4, 435–436.) The California Supreme Court observed that it was unclear "whether the [elderly couple's] case [fingerprint] comparisons were not included in the recheck, or were included but found not to be in error." (*Id.* at p. 436.) However, as the court further observed, the fingerprint examiner's work was doublechecked "in a different way," in 1987, when "several of the latent prints from the [elderly couple's] case were compared with prints in a computerized fingerprint database." (*Ibid.*; *id.* at p. 418, fn. 5.)

46

sufficient evidence exists to warrant bringing charges.'" (*Ibid*.) The court deferred to the People's charging discretion and on that basis found the prosecution was "justified in waiting until it had evidence connecting [the] defendant to the crime scene before arresting him and charging him with murder." (*Ibid*.)

The defendant argued the investigation was negligent because law enforcement *should have* discovered the fingerprint match sooner, because it was aware of the fingerprint examiner's incompetence at the time of the original investigation in 1984. (*Cowan, supra,* 50 Cal.4th at pp. 435–436.) The court squarely rejected this contention, too, and applied the rule that "'[a] court may not find negligence by second-guessing . . . *how law enforcement agencies could have investigated a given case.*'" (*Id*. at p. 435, quoting *Nelson, supra,* 43 Cal.4th at p. 1256.) Despite what was clearly an error by the first fingerprint examiner, and the prosecution's failure to uncover that error for many years, our high court found the defendant's contentions amounted to the type of second-guessing that was "condemned" under *Nelson*. (*Cowan*, at p. 436.)

The defendant also asserted the case had improperly been allowed to go "dormant." (*Cowan, supra*, 50 Cal.4th at p. 436.) Citing again to *Nelson*, the court rejected the defendant's contention, stating, "we will not second-guess the department's decision to allocate its resources in this manner." (*Ibid*.)

Our high court concluded "[t]he delay was 'investigative delay, nothing else.'" (*Cowan, supra* 50 Cal.4th at p. 434.) It summarized its conclusions as follows: "[T]he investigation of the . . . murders was not perfect; no investigation is. Like the trial court, however, we find no evidence that law enforcement or the prosecution deliberately delayed the investigation in order to gain a tactical advantage over defendant. Nor do we find evidence of

47

negligence. Rather, at worst the . . . [d]epartment simply erred when it failed to determine before 1994 that defendant's fingerprints matched the [crime] scene latent prints. That being the case, balancing defendant's weak showing of prejudice against the strong justification for the delay . . . , we find no due process violation." (*Id.* at p. 436, citation omitted.)

## II.

### *The Trial Court Erred When It Dismissed the Case for Precharging Delay*

Applying these settled legal principles to this case, we hold the trial court erred when it concluded the People negligently delayed filing the murder charge against McInnis. The 27-year delay in charging him with the Senser murder is nearly indistinguishable from the investigative delay that was determined to *not* be a due process violation by our high court in *Cowan* and another case we shall discuss, *Bracamontes*, *supra*, 12 Cal.5th 977.

A.     *The Trial Court's Ruling on McInnis's Motion to Dismiss*

McInnis asserted the prosecution's 27-year delay in charging him with murder was "negligent and unjustified" and resulted in "the loss and destruction of critical evidence." He claimed the prosecution "had sufficient evidence of [his] involvement in the Senser murder to charge him in 1994," but "negligently waited until 2018 to test certain items for DNA that were found at the [homicide] scene," including the kitchen knife wrapped in the napkin and the car seat covers from Senser's car. In his view, "the DNA recovery and testing techniques used in 2018 were available in 1994 and the [24] years that preceded the prosecution's initial 2018 testing." He argued "there was no reasonable justification for this delayed prosecution" nor for the additional two-and-a-half-year delay (2018 to 2021) that followed for more DNA testing.

48

In opposition, the People asserted the prejudice claimed by McInnis was "overstated, speculative, or meritless." They offered to stipulate to the admission of recorded statements and the prior testimony at Thomas's trial by many witnesses. This stipulation included the police statements and lineup documentation for Arthur and Campion, which were all preserved. Campion's grand jury testimony and trial testimony were also available from Thomas's trial. The People argued the admission of the proffered evidence rendered any potential prejudice de minimus.

The People further asserted the delay was neither tactical nor negligent, but rather "justifiable investigative delay," for two reasons. (Capitalization and boldface omitted.) First, they contended DNA technology was not sufficiently advanced to test the napkin and seat cover in 1994 and obtain comprehensible results. The People acknowledged the technology to test an item for touch DNA existed in 1994, and that it was possible to analyze items with two contributors, such as the napkin. But they presented expert testimony that such testing was uncommon at that point in time. They also asserted the technology to accurately determine DNA contributions in a mixed sample with three or more sources, such as the M-Vac sample from the car seat cover, did not become available until 2015.

Second, the People argued they were ethically prohibited from bringing criminal charges in 1994 because prosecutors did not have a good faith belief the evidence they had met the required high standard. They explained that, in 1994, although "investigators believed [McInnis] was the second suspect," they had not discovered "physical evidence at the time linking him to the crime scenes or the stolen cars." Without such forensic evidence, the People did not believe they could convince a jury of McInnis's guilt beyond a reasonable doubt. And, in 2019, after they obtained results connecting

49

McInnis to the napkin and car seat cover, they continued to test additional items to confirm they "were on the right path." They also continued testing because juries are reluctant to convict when potentially relevant evidence is left untested.

The People represented that "as soon as [they] were able to ethically charge [McInnis], [they] did, in June of 2021." They asserted their decision to not file charges in 1994 and not reopen the case until 2018 was not subject to judicial second-guessing. Citing to *Nelson*, they argued courts are required to defer to prosecutors "in their decision as to whether and when to bring charges in a particular case because of the prosecutor's special duties and obligations." They further argued courts are required to defer to how the state chooses to allocate its investigative resources. In particular, "[t]he California Supreme Court has made clear that the court cannot find negligence because [a] case was not made the first priority immediately after . . . DNA testing technology advanced. To find otherwise would place an arbitrary statute of limitations on the most heinous of crimes."

As noted, the trial court granted McInnis's motion after conducting a three-day evidentiary hearing and dismissed the entire action. Assessing prejudice first, the court found "the death of eyewitness . . . Campion yield[ed] serious prejudice," and "[t]he failing memory of eyewitness . . . Arthur compound[ed] this prejudice."

Turning to the People's two justifications for the delay, the trial court rejected the People's first explanation, which was that DNA technology was not sufficiently advanced to test the napkin in 1994. The court found "the testimony at the evidentiary hearing contradict[ed] that claim." Based on that testimony, the court concluded the technology to test and analyze touch DNA on samples with two contributors, like the DNA obtained from the

50

napkin, "was feasible at the time of the crime." The court ruled, "[t]he fact that the SDPD laboratory did not ordinarily test items like the napkin at that time [did] not provide a justification for delay."[19]

Addressing the People's second justification for the delay, the trial court called the investigation of McInnis an "investigatory failure." Starting with the DNA evidence on the napkin—which the court called "the smoking gun"—the court ruled the People's delay in testing the napkin was negligent. Crediting testimony by the defense expert that "people often use napkins to wipe their mouths or blow their noses and, as a result, napkins can be rich sources of DNA," the court found "[t]he expert testimony establishes that the napkin *could have* been fruitfully tested for DNA in 1994." (Italics added.) The court then found the napkin was a "crucial piece of evidence" and "that law enforcement *would have tested* [it] in the mid-1990s *had they acted with reasonable diligence*." (Italics added.) It thus found "[t]he delay occurred because law enforcement failed to avail themselves of . . . technology [available] at [the time of the crime] and for more than two decades after."

Turning to the car seat cover, although the trial court noted that the M-Vac technology was not in use "before 2010," it found that "ordinary swabbing can achieve a similar result" in the collection of evidence from Senser's car seat cover. But as to analyzing the four-person mixture from the seat cover, the court accepted that the DNA result connecting McInnis to the inside of Senser's car "could not have been obtained using the technology that existed in 1994." The court found, as the experts had agreed, that a criminalist

---

19     On appeal, the People have not renewed their argument that DNA technology was not sufficiently advanced to test the napkin in 1994, but if they had, we would find the trial court's ruling supported by substantial evidence.

"would have been unable to parse" the four-person mixture until the technology became available in the early 2000s and that it was not until STRmix—which it called "a game-changer"—became available "around 2015" that this "type of complicated mixture analysis [became] much more practical."

Nonetheless, the trial court rejected the People's explanation that the delay in testing the evidence from the car seat cover was justified by "resource constraints." But the court did so because, in its view, the DNA result from the car seat cover had "minimal probative value." Comparing it to the napkin result with a "powerful likelihood ratio of 9.47 x $10^{18}$," the court opined the presence of McInnis's DNA on the seat cover with a "low likelihood ratio" of 7.83 did "not place [him] in . . . Senser's car with any reasonable level of certainty and [did] not markedly alter the balance of the evidence." "Put simply," by the court, "this weak DNA finding offers minimal, if any, justification for the nearly 27-year delay in charging" McInnis.

The trial court also believed the People were required to provide a "legally acceptable justification" for *reopening* the case, because it believed there was already in 1994 "strong circumstantial evidence [that] showed [McInnis] participated in Senser's murder" and then in 1996, "Thomas claimed [McInnis] was the actual killer." It found "law enforcement did nothing on the case for a remarkable 22 years," while "evidence of [McInnis's] involvement did not change during that entire period."

The trial court further believed this case was not a "true cold case in which law enforcement exhausts every avenue of investigation at the time of the crime before a technological breakthrough decades later leads to key new evidence." In its view, "[t]he case became 'cold' only by virtue of th[e] investigatory failure." It determined there was no " 'new' evidence but,

52

rather, evidence that law enforcement rediscovered after an undue hiatus." Characterizing "this case [as one that] simply sat in a file cabinet or on someone's desk for more than two decades," the court found "[s]uch an inexplicable period of inactivity is negligent" and "precludes a finding of justified delay."

Having found negligent delay, the trial court concluded the prejudice to McInnis was substantial and the prosecution's justification for the delay "de minimis." (Italics omitted.) Given the de minimis weight, it found the balance of equities in favor of McInnis and further found that no remedy short of dismissal could address the lost testimony by Campion and Arthur. The court explained that it had "reviewed several remedies short of dismissal, including admitting transcripts of prior testimony, admitting police records such as reports and lineup documentation, instructing the jury as to the existence of specific facts, and accepting stipulations regarding the reasons for certain witnesses' unavailability." But it determined that "even if these extraordinary measures were taken at trial, any potential defense would still be compromised by the loss of live witness testimony, potential lost physical evidence, and the negligent delay in bringing the matter to trial." Thus, in the court's view, "[McInnis] cannot receive a fair trial and dismissal is the only reasonable remedy."

B.  *Analysis*

   1.  *Prejudice from the Delay*

Starting with prejudice from the delay, the People do not dispute that McInnis made the minimal showing required at this first stage of the analysis. Two witnesses to the carjacking that preceded Senser's murder are unavailable. One is dead and the other is unable to remember attending the photographic and live lineups that took place in 1994. Campion, the witness

who passed away, failed to identify McInnis in a live lineup. Arthur, the witness with a fading memory, identified another suspect (Boykin) as one of the perpetrators. The trial court's determination that McInnis was prejudiced by the unavailability of these two witnesses is supported by substantial evidence. The court properly determined that McInnis satisfied his first-step burden. We proceed to the second step.

2.    *Justification for the Delay*

The trial court erred at this second step of the analysis. The court misapprehended the governing law when it determined "the People did not establish an adequate justification for the delay." The court failed to correctly distinguish between investigative and negligent delay. It also impermissibly second-guessed the prosecution's investigative and charging decisions when it concluded the delay here was caused by negligence. A trial court abuses its discretion when its decision is predicated on an incorrect understanding of the law. (*People v. Knoller* (2007) 41 Cal.4th 139, 156.)

We start with the People's assessment of the evidentiary case against McInnis, and their judgment as to whether the evidence was sufficient to support criminal charges. By early 1994, the People had amassed strong circumstantial evidence that McInnis was Thomas's accomplice. As summarized by the trial court: "[McInnis] and Thomas, who confessed to and was later convicted of the murder, were friends. [McInnis] pled guilty to the very similar Johnston carjacking, which occurred just two evenings prior to the Senser carjacking and murder. A jury later convicted Thomas of the Johnston carjacking as well. T[.] Jackson observed [McInnis] and Thomas together shortly before and after the Senser carjacking. Jackson saw [McInnis] and Thomas carrying grocery items . . . when they returned at around 4:00 a.m. the morning of Senser's murder. Grocery bags had been

54

observed at the Senser carjacking scene. Jackson also reported hearing Thomas and [McInnis] speak on the phone about a red car. Senser drove a red car on the night of his murder. Jackson and N[.] Johnson later saw [McInnis] recover a knife from a rain gutter at Jackson's apartment. According to Jackson, [McInnis] threw the knife down onto the grass, and Thomas put it in his pocket. Senser was stabbed to death." (Fn. omitted.)

It is undisputed though, that despite this strong circumstantial evidence, the People did not believe they had sufficient evidence to convince a jury that McInnis was guilty beyond a reasonable doubt. DAI Johnson personally reviewed the entire investigative file multiple times and discussed the case with Bost, the original prosecutor. Johnson testified McInnis was a "strong suspect" in 1996 but explained this was one of many cases where detectives were "pretty sure [they] kn[e]w who did it, but just not quite enough to get over the hump." And he specifically testified Bost recruited him in 2018 to work on the case because "he felt that more work could be done to identify the second offender."

Contemporaneous documents admitted at the evidentiary hearing are also unequivocal on this point. In 1995, defense counsel made a record when McInnis pled guilty to the Johnston carjacking that the District Attorney's Office wanted to charge McInnis with Senser's murder but felt there was insufficient evidence to do so at that point in time.

The People's actions in the period from 1994 to 1996 were also consistent with their charging analysis. The People charged Thomas with Senser's murder. They successfully marshalled the evidence and subpoenaed the witnesses they needed to obtain a guilty verdict. But they refrained from charging McInnis with Senser's murder, seeking only convictions for Johnston's carjacking and accessory after the fact to the murder. The record

55

reveals no reason for this decision other than the People's good faith belief they did not have sufficient evidence to obtain a murder conviction against McInnis. The trial court made no contrary finding, and McInnis does not argue the People had some tactical reason for this decision.

As we have recounted in detail, the District Attorney's Office revisited the case in 2018 to take a fresh look at the evidence. Had prosecutors decided to file charges right away, based on "a good faith re-evaluation of the *same evidence*" (*Penney, supra,* 28 Cal.App.3d at p. 953, italics added), it would be inappropriate to categorize the delay as investigative delay (see *Hartman, supra,* 170 Cal.App.3d at p. 582). But prosecutors did not simply change their mind about the strength of the existing evidence against McInnis. They filed charges only after testing dozens of items for DNA and obtaining DNA evidence that placed McInnis at the scene where Senser was carjacked and inside Senser's car, and that excluded Boykin as a contributor to the DNA found on the car seat cover and a large number of other items found in Senser's car. In their view, this was sufficient new evidence to make the murder case against McInnis finally prosecutable. The delay was therefore investigative and entitled to strong weight in the third step balancing test, not the lesser weight that would have been warranted had the prosecution team simply reconsidered its previous decision. (*Nelson, supra,* 43 Cal.4th at p. 1256.)

The trial court abused its discretion when it determined otherwise. The court did not follow controlling law when it engaged in precisely the kind of "Monday morning quarterbacking" of the prosecution's investigative and charging decisions that is prohibited by *Nelson* and *Cowan*. (*Cowan, supra,* 50 Cal.4th at p. 436; accord *Booth, supra*, 3 Cal.App.5th at p. 1310.)

56

First, courts may not find negligence by second-guessing "how law enforcement agencies *could have* investigated a given case." (*Nelson, supra,* 43 Cal.4th at p. 1256, italics added.) Yet, the court here found negligent delay on the part of the prosecution precisely because it believed the napkin that was wrapped around the knife "*could have* been fruitfully tested for DNA in 1994," and "law enforcement *would have* tested [it] in the mid-1990's *had they acted with reasonable diligence.*" (Italics added.) It was improper overreach for the court to find the People negligent for not discovering the DNA match in 1994 based on *its own view* of how the investigation should have proceeded.

Second, in addition to second-guessing the People's investigative decisions, the trial court erred when it found negligence based on its own view of the strength of the case against McInnis as it was in 1994. The court criticized the People's decision to not charge McInnis with Senser's murder in 1994 because, in its view, there was already "strong circumstantial evidence" showing McInnis "participated in Senser's murder." The court believed "law enforcement did nothing on the case for a remarkable 22 years" despite the strong circumstantial evidence, and "[t]he evidence of [McInnis's] involvement did not change during that entire period." Thus, according to the court's view, "[t]his timeline indicates this case simply sat in a file cabinet or on someone's desk for more than two decades" and "[s]uch an inexplicable period of inactivity is negligent."

This aspect of the trial court's reasoning violated the separation of powers prohibition against second-guessing " 'the prosecution's decision regarding whether sufficient evidence exists to warrant bringing charges.' " (*Cowan, supra,* 50 Cal.4th at p. 435; see *id.* at pp. 435–436.) "The determination of when the evidence available to the prosecution is sufficient

57

to obtain a conviction is seldom clear-cut, and reasonable persons often will reach conflicting conclusions." (*Lovasco*, *supra*, 431 U.S. at p. 793.) Reconsideration of such decisions with 20/20 hindsight may be tempting, but as we have explained, is firmly prohibited by settled authority. (*Nelson, supra,* 43 Cal.4th at p. 1256; see also *Cowan,* at pp. 435–436 [declining to second-guess the prosecution's decision to wait to charge the defendant until it had evidence connecting him to the crime scene].)

For this same reason, the trial court overstepped its authority when it based its ruling on its own view of the evidentiary value of the DNA test results from the car seat cover. The court may not have been persuaded the car seat cover had significant evidentiary value in terms of placing McInnis inside Senser's car, *but the People were.* In their view, the results also had value in terms of excluding Boykin as a contributor and sanitizing any taint of the earlier laboratory work performed by the disgraced criminalist, as did the additional testing of other items, which they continued to do until they were satisfied they were able to "ethically charge [McInnis] . . . in June of 2021."

Finally, the trial court erred when it ruled that "a prosecutor's desire to achieve closure on a decades-old case before retirement does not constitute a legally acceptable justification for delay," and, as a result, "law enforcement's negligence for decades precludes a finding of justified delay." The court's view that resources should have been devoted to reopening the case sooner than they were also constitutes more impermissible second-guessing. "It is not enough for a defendant to argue, [as McInnis does], that if the prosecutorial agencies had made his or her case a higher priority or had done things a bit differently they would have solved the case sooner." (*Nelson, supra,* 43 Cal.4th at p. 1257; accord *Booth*, *supra*, 3 Cal.App.5th at p. 1310

58

[rejecting the defendant's claim law enforcement "was negligent for failing to conduct their investigation differently"].)

There is no statute of limitations to bring charges for murder and consequently no deadline for prosecutors to forever close a homicide case investigation. (§ 799.) The trial court improperly took issue with "how the state allocates its resources" when it rejected as legally unacceptable the prosecutor's decision to try and persuade the District Attorney's Office to reopen the investigation after a long period of inactivity. (*Nelson, supra*, 43 Cal.4th at p. 1256.) While the discovery of new technology or new evidence may provide stronger justification for reopening an investigation than the mere desire to take a fresh look at the evidence, we see nothing wrong or legally improper about reopening a cold case for this reason. (See *Cowan, supra,* 50 Cal.4th at p. 420 [case reopened when a patrolman involved in the original investigation was promoted to detective].) If prosecutors simply reevaluate the same evidence and decide it had been sufficient all along to file charges, then reopening for this reason will provide weak justification for the delay when weighed against prejudice to the defendant and potentially warrant dismissal. (*Penney, supra,* 28 Cal.App.3d at p. 953.) But if further investigation is undertaken, and that investigation leads to new evidence that finally makes a case prosecutable, the delay is investigative and weighs heavily in favor of the prosecution in the balancing test. (*Nelson, supra,* 43 Cal.4th at p. 1256.)

In its written ruling, the trial court acknowledged the concept of "investigative delay," but it did not faithfully apply *Nelson*. The court attempted to distinguish the DNA testing here on the ground that "*Nelson* typifie[d] a true cold case in which law enforcement exhausts every avenue of investigation at the time of the crime before *a technological breakthrough*

59

decades later leads to key new evidence." (Italics added.) In the court's view, "[i]n that situation, resource constraints can license further delay in testing as law enforcement is forced to grapple with the new technology and prioritize cold cases against each other." By contrast, the court found the instant case "[was] not a cold case as the term is commonly used," and that the evidence was not " 'new' evidence but, rather, evidence that law enforcement rediscovered after an undue hiatus."

The trial court's rationale for diverging from *Nelson's* holding lacks merit. *Cowan* also was "not a cold case as the term is commonly used," and was also a case involving an investigation revived based on evidence (fingerprints) "rediscovered" after a hiatus. Our high court's decision in *Bracamontes*, *supra*, 12 Cal.5th at page 977, is yet another directly on point.

In *Bracamontes,* a young girl was kidnapped and later found in a parking lot near her home. (*Bracamontes, supra*, 12 Cal.5th at p. 983.) She had been strangled and stabbed. Investigators swabbed her mouth, vagina, anus, and neck, but did not examine her clothing for biological matter. The initial examination of the swabbed material did not reveal the presence of sperm. The district attorney had sufficient evidence to suspect the defendant. However, as was the case here with the need to exclude Boykin as a viable suspect, there was not enough evidence to rule out other third-party suspects. (*Id.* at pp. 983–984.)

More than 10 years later, the district attorney in *Bracamontes* established a cold case unit. (*Bracamontes*, *supra*, 12 Cal.5th at p. 984.) The unit re-examined the autopsy swabs from the victim's body using new technology and discovered the presence of the defendant's semen. (*Id.* at p. 987.) The cold case unit, however, also discovered the defendant's semen by examining the victim's clothing using an "alternate light source." (*Id.* at

60

p. 984.) As was the case here with touch DNA testing, the "alternate light source" technology was available at the time of the original investigation; investigators just did not think to use it on the girl's clothing. Had they done so, they would have been able to obtain a DNA match to the defendant and charge him much earlier.[20] (*Id.* at pp. 983–984, 988.)

The defendant moved to dismiss the charges. He argued "the charging delay was unjustified because evidence of sperm on the victim's clothing, and thus, [his] DNA, *could have* been detected sooner using technology available at the time." (*Bracamontes, supra,* 12 Cal.5th at p. 988, italics added.) Citing to the now familiar rule in *Nelson*, our high court squarely rejected this argument because " '[a] court may not find negligence by second-guessing how the state allocates its resources or how law enforcement agencies could have investigated a given case.' " (*Bracamontes*, at p. 988.) The court found " '[t]he delay was investigative delay, nothing else.' " (*Id.* at p. 989.)

The trajectory of the Senser murder investigation is analytically indistinguishable from the investigations in *Bracamontes, supra,* 12 Cal.5th 977 and *Cowan, supra,* 50 Cal.4th 401. At the time of the original investigation, from 1994 to 1995, law enforcement believed McInnis was Thomas's accomplice, but did not believe there was sufficient evidence to

---

20    The dissent characterizes *Bracamontes* as "focused" on the new technology that enabled the discovery of sperm on the victim's *body*. (Dis. opn., *post*, at p. 24.) Like its reading of *Cowan*, the dissent's reading of *Bracamontes* is inaccurate, too. The argument that was raised by the defendant in *Bracamontes*, and specifically addressed by our high court, concerned the sperm that was found on the victim's *clothing*, which was discovered using the alternate light source and, which was not new technology unavailable at the time of the original investigation. (*Bracamontes, supra,* 12 Cal.5th at pp. 984, 988.)

61

convict him. The prosecution did not have physical evidence directly connecting McInnis to the scene of the carjacking or the interior of Senser's car, and Boykin had been implicated as a suspect by Thomas, Arthur, and Lawson's botched blood-type test, all of which would be troubling to a jury. Although the napkin had been collected and could have been tested for touch DNA at the time of the original investigation, detectives simply did not think to request a test, because it was not common forensic practice. The case became a cold one. It was reopened after many years, in 2018, because the original prosecutor had always been troubled by the failure to bring Thomas's accomplice to justice. After the napkin tested positive for McInnis's DNA, investigators closed out the possibility that someone else's DNA, especially Boykin's, was on one of the many items in Senser's car and filed charges when they were satisfied they could obtain a conviction against McInnis. None of these facts deviate in a material way from the facts at issue in *Bracamontes* and *Cowan*.

Citing to *Mirenda*, *supra*, 174 Cal.App.4th 1313*,* McInnis contends that "prolonged inaction," in and of itself, can take preaccusatory delay out of the realm of investigative delay and render it negligent. Under our high court's precedents, we cannot agree. Instead, the holding in *Mirenda* is consistent with the principles we have discussed.

As a preliminary matter, the *Mirenda* decision addresses the state constitutional right to a speedy trial (Cal. Const., art. I, § 15, cl. 1), not the state constitutional right to due process (Cal. Const., art. I, § 15, cl. 7), which is at issue here. For purposes of our specific discussion, however, this is a distinction without a difference. The analysis of prosecution delay is the same "regardless of whether [a] defendant's claim is based on a due process analysis or a right to a speedy trial not defined by statute." (*Scherling v.*

*Superior Court* (1978) 22 Cal.3d 493, 505.)  For both, "any prejudice to the defendant resulting from the delay must be weighed against justification for the delay." (*Ibid.*)

In *Mirenda*, the defendant shot and almost killed his roommate in 1981.  Eighteen days after the shooting, the district attorney filed a felony complaint charging him with attempted murder and related offenses.  Thirteen days after that, the district attorney obtained a warrant for his arrest.  (*Mirenda, supra,* 174 Cal.App.4th at p. 1318.)  Highly unusual circumstances then followed.  The defendant fled California, so law enforcement was unable to locate him and therefore unable to execute the warrant and bring him to court to face charges.  (*Ibid.*)  A year and a half later, in 1982, he was finally located in Pennsylvania.  By then, however, the district attorney was unable to locate the victim.  (*Ibid.*)

The defendant waived extradition and agreed to return to California to face the charges, but the district attorney decided the prosecution of the case could not go forward without the victim's testimony.  The defendant was released from custody in 1982, nine days after he was arrested, and his lawyer told him the complaint had been dismissed.  (*Mirenda, supra,* 174 Cal.App.4th at p. 1318.)

Unbeknownst to the defendant, however, the complaint remained on file.  The warrant for his arrest also remained outstanding, but with one significant change.  (See *Mirenda, supra,* 174 Cal.App.4th at pp. 1318–1319.)  To prevent the defendant from being re-arrested before they located the victim, prosecutors strategically changed the scope of the warrant from nationwide applicability to " 'California only.' " (See *id.* at pp. 1319, 1332–1333.)  Then, except for one brief attempt to locate the defendant in 1999, prosecutors did nothing for 25 years.  (*Id.* at p. 1323.)

In 2007, the defendant applied for social security benefits and was told "he needed to clear a California warrant for his arrest." (*Mirenda, supra,* 174 Cal.App.4th at pp. 1318–1319.) When prosecutors learned he was attempting to clear the warrant, they successfully located the victim and resumed the prosecution. The defendant was arrested in Arizona and arraigned in late 2007. (*Id.* at p. 1319.) He promptly filed a motion to dismiss for preaccusation delay. (*Id.* at p. 1320.) *Mirenda* thus involved a case "where 26 years passed between *the time the criminal charges were filed* and the time when the prosecution actually started." (*Id.* at p. 1317, italics added.)

In assessing the prosecution's justification for the delay, the *Mirenda* court acknowledged and gave deference to prosecutors' prerogative to refrain from filing charges until they are satisfied they can obtain a conviction. (*Mirenda, supra,* 174 Cal.App.4th at p. 1329.) But the court observed that prosecutors there had filed a complaint, which necessarily showed they had a good faith belief they could obtain a conviction. The court explained: "Although the victim . . . could not be located in 1982, the case was then ripe for prosecution because the investigation was complete. *All the evidence of the crime had been collected*, the identity of the shooter was known, statements of the victim and eyewitness were taken and included in various police reports of the incident, and the treating physician was alive. Although we appreciate that prosecutors are under no obligation to proceed with a case before they are satisfied that guilt can be proved beyond a reasonable doubt or before all the resources are reasonably available, *here charges were in fact filed* and a warrant issued in 1981." (*Id.* at p. 1333, italics added.)

The *Mirenda* court found the district attorney's lengthy inaction after charges were filed to have been completely unjustified. (*Mirenda, supra*, 174 Cal.App.4th at pp. 1332–1333.) The court further found the unjustified delay

64

to have been compounded by the prosecution's "intentional tactical decision" not to extradite the defendant and to change his arrest warrant to " 'California only.' " (*Id.* at p. 1333.) Balancing prejudice against the lack of any justification, the court upheld the trial court's decision to dismiss the prosecution. (*Id.* at pp. 1333–1334; see also, *People v. Hill* (1984) 37 Cal.3d 491, 495–497 [finding negligent delay by the prosecution under similar circumstances].)

In *Mirenda*, the court thus found a lack of investigative delay without second-guessing the prosecution's investigative and charging decisions. Because prosecutors had filed a complaint against the defendant and obtained a warrant for his arrest, it was clear from the record they had the evidence they believed they needed to convict the defendant as soon as a month after the murder took place. It was therefore also clear that the subsequent *prolonged inaction* in that case was due to a combination of intentional and negligent conduct by the prosecution and not due to detectives being stumped by the case or any other kind of investigative delay.

Here, by contrast, the record contains no evidence at all that the original prosecutor in 1994 believed he could win a conviction against McInnis for Senser's murder. Reasonable minds could disagree as to whether the evidence was or was not sufficient to file charges, but *this prosecutor*, despite going forward with charges against Thomas, charged McInnis with the Johnston carjacking and accessory after the fact with respect to Senser's murder only. He also specifically told defense counsel and Thomas's jury that he believed he did not have enough evidence to go forward.

To sum up this second step of the analysis, while substantial evidence supported the trial court's finding that the napkin could have been tested in 1994, the court misunderstood the applicable law and incorrectly found this

65

fact probative of negligent prosecution delay and not investigative delay. The court further erred as a matter of law when it found the prosecutor's reason to reopen the case was not "legally acceptable" and second-guessed the prosecution's investigative and charging decisions. Consequently, the court abused its discretion when it found the precharging delay was negligent delay due to "investigatory failure."

Finally, based on the trial court's specific finding that McInnis's DNA on the napkin was "crucial" evidence, and after a thorough review of the record with appropriate deference to the court's other factual findings, we conclude the record overwhelmingly establishes the delay in the instant case was investigative delay entitled to strong weight in the balancing process. We find no substantial evidence otherwise and therefore no need for this prong of the analysis to be revisited on remand.[21]

---

[21] The dissent asserts our remand order should permit the trial court to reassess the evidence of investigative delay and "clarify" whether it made a credibility finding in its ruling that the People presented false testimony and evidence about their charging decision at the evidentiary hearing. (Dis. opn., *post*, at p. 22; *id.* at pp. 2–3.) We do not agree an open-ended remand is appropriate, nor is there any need for the court to clarify its ruling. Appellate courts have authority to issue remand orders that delineate "further proceedings as may be just under the circumstances." (§ 1260.) And they "may use this authority as appropriate when the circumstances demonstrate that an open-ended remand would truly be an idle act." (*People v. Dain* (2025) 18 Cal.5th 246, 263, fn 4.)

3.    *Balancing Prejudice and Justification*

Turning to the third step in the analysis, balancing prejudice and justification, the trial court's error in the previous step is consequential. The justification for precharging delay is considered strong when it is due to investigative delay, whereas negligent delay is given little to no weight when balanced against prejudice to the defendant. (*Nelson, supra,* 43 Cal.4th at pp. 1255–1256.) The People's justification should have been given strong, not de minimis, weight. (See *Booth, supra,* 3 Cal.App.5th at p. 1308 [balancing substantial prejudice against strong justification for investigative delay and finding prejudice to the defendant could be mitigated by presenting evidence to the jury through alternate means].) The court's error at the second step infected and skewed the final balancing test it performed between prejudice and justification.

As a remedy for the error, the People at oral argument took the position that the case should be "reversed and remanded back to the trial court with

---

Here, we see no indication the trial court questioned the People's veracity about the decision to not charge McInnis with murder in 1995, McInnis does not argue the People were disingenuous, and we observe no substantial evidence in the record to support such a finding. Transcripts from contemporaneous hearings document Bost's opinion there was insufficient evidence to charge McInnis in 1995. The case was reopened at Bost's request to conduct touch DNA testing on items that had not been previously tested. And the trial court specifically found the DNA evidence on the napkin, not discovered until 2018, was crucial to the People's case. These findings were made by the trial court itself and/or were not disputed by the parties. And they point unequivocally to investigative delay from 1995 to 2018, which is when Campion passed away. McInnis points to no evidence the People engaged in purposeful, reckless, or negligent delay within the meaning of *Nelson*. Reconsideration of this prong of the test is thus unwarranted.

67

instructions to follow the proper guidelines and parameters set forth in *Bracamontes* and *Cowan* and *Nelson* in order to re-engage in th[e] balancing test." We agree this is the appropriate remedy. The balancing test is a fact-intensive inquiry that should be conducted at the trial court level in the first instance.

In addition, we acknowledge circumstances have not been frozen during the pendency of this appeal and that the prejudice to McInnis's defense caused, in part, by the loss of live testimony by Arthur and Campion may have been compounded by the loss or deterioration of additional evidence. Although prejudice to the defense caused by delay that occurs after charges are filed is not ordinarily considered when assessing a motion to dismiss for precharging delay, under the highly unusual circumstances presented here— where charges filed decades after the murder were dismissed and are now being reinstated after more than two years of additional delay—we believe consideration of the possibility of additional, cumulative prejudice to McInnis's defense is needed to ensure he receives a fair trial. At the renewed proceedings, McInnis shall therefore be permitted to adduce evidence of any changed circumstances during the pendency of this appeal which may have compounded the prejudice to his defense.

The trial court shall also reconsider whether other measures can be taken that "adequately address[ ] the loss of relevant evidence in a manner that affords [the] defendant due process and a fair trial." (*People v. Conrad* (2006) 145 Cal.App.4th 1175, 1186.) This includes both the loss of live testimony by Arthur and Campion and any further prejudice found to have occurred during the pendency of this appeal. Trial courts have broad discretion to fashion a remedy when prosecution delay has resulted in a loss of evidence favorable to the defense. (*Price, supra*, 165 Cal.App.3d at p. 545.)

68

When there has been a "delay in prosecution [that] resulted in the loss to the defense of identifiable evidence, the prejudice to the defendant may be substantially mitigated, even virtually eliminated, by presenting the evidence to the jury through alternate means." (*Conrad,* at p. 1185.) "[P]rejudice from fading witness memories due to passage of time is diminished where contemporaneous police reports exist that may be introduced into evidence or used to refresh the witness's recollection." (*People v. Mataele* (2022) 13 Cal.5th 372, 409; see *id.* at pp. 407–408.) "[P]rejudice from fading witness memories due to delay" is also minimal when the interviewing officer can introduce a prior statement. (*Cowan, supra,* 50 Cal.4th at p. 433; see *id.* at pp. 431–433.)

    4.    *Instructions on Remand*

We reverse the trial court's order dismissing the action and remand the case. If the People choose to proceed after the case is reinstated, the court is directed to reopen the evidentiary hearing. The court is to conduct the third step of balancing the prejudice to McInnis against the People's strong justification of investigative delay. The court shall allow McInnis an opportunity to present evidence that changed circumstances during the pendency of this appeal have compounded the prejudice to his defense case caused by the People's charging delay. The court is directed to reconsider whether pretrial dismissal is appropriate after properly balancing the harm to McInnis against the People's justification for the delay and considering possible alternative remedies to mitigate the prejudice.

III.

*Response to the Dissent*

The dissent would affirm the trial court's ruling dismissing the murder case against *McInnis*. But, in our view, it would be doing so based on

69

reasoning that misreads and misapplies our high court's controlling decisions, in multiple ways, and on credibility determinations and factual findings the trial court did not make.

*First*, the dissent believes our Supreme Court used the term "negligence" in *Nelson* (and thus also in *Cowan* and *Bracamontes*) "broadly, and primarily as a *shorthand* to reference forms of delay that may not be purposeful but are nevertheless *problematic*." (Dis. opn., *post*, at pp. 6–7, italics added.) We do not find it plausible that our high court would be so cavalier as to "shorthand" its analysis of a criminal defendant's claim of a due process violation. The court specifically held: "[U]nder California law, negligent, as well as purposeful, delay in bringing charges may, when accompanied by a showing of prejudice, violate due process." (*Nelson*, *supra*, 43 Cal.4th at p. 1255.) The court did not hold due process may be violated by "problematic" delay. The federal district court case relied on by the dissent (*United States v. Gross* (E.D.N.Y. 2001) 165 F.Supp.2d 372) to support its interpretation of our high court's holdings pre-dates *Nelson* and does not acknowledge or discuss the separation of powers doctrine that is the foundation of *Nelson*, as well as *Cowan* and *Bracamontes*. (Dis. opn., *post*, at pp. 8, 14, 20.)

*Second*, the dissent suggests the test in *Nelson* for assessing whether precharging delay violates due process is for courts to take a "*more holistic approach*," determine where the prosecution's justification for the delay "*lands on a scale* ranging from purposeful (no justification) to legitimate (strong justification)," and then balance the justification and prejudice "*on a continuum*." (Dis. opn., *post*, at pp. 4, 6, 2, italics added.) None of these italicized words, nor any of their possible synonyms, appear in *Nelson*, or in *Cowan and Bracamontes*, or in Courts of Appeal decisions applying their

70

holdings. (See, e.g., *Booth*, *supra*, 3 Cal.App.5th 1284.) This is a new test announced by the dissent.

*Third*, the dissent misunderstands the *Nelson* rules because it has conflated the distinct concepts of second-guessing a decision and assessing whether a stated reason offered by the People is true and supported by sufficient evidence.[22] Based on this misunderstanding, the dissent asserts we have misread *Nelson* to require a court to find investigative delay whenever the prosecutor can point to "*any* new evidence" and "subjectively claim" it "now tips the scales in favor of prosecution." (Dis. opn., *post*, at pp. 11, 1, 13.) On the contrary, we have said exactly the opposite: "Th[e] deference owed by the judicial branch to the People's investigative and charging decisions does not immunize those decisions from *all* scrutiny in the context of a motion to dismiss for precharging delay. The People's assertions about their view of the evidence are not unimpeachable. Nor are they binding on trial courts when they find no evidentiary support in the record." (*Ante*, at p. 43.)

The rules we follow under *Nelson* simply prohibit courts from second-guessing the People's investigative and charging decisions. As our Supreme Court has repeatedly explained, that means courts may not substitute their judgment for what could and should have been done during a criminal

---

22 The definition of "second-guess" is "to criticize or question actions or decisions of (someone) often after the results of those actions or decisions are known." (Merriam-Webster Dict. Online (2025) <https://www.merriam-webster.com/dictionary/second-guess> [as of Nov. 13, 2025], archived at <https://perma.cc/UK6C-XRKQ>) Whereas, to question someone's "veracity" is to question their "conformity with truth or fact." (Merriam-Webster Dict. Online (2025) <https://merriam-webster.com/dictionary/veracity> [as of Nov. 13, 2025], archived at <https://perma.cc/63YE-YS6A>.)

investigation, and when charges could and should have been filed.  (*Nelson,
supra,* 43 Cal.4th at p. 1256; *Cowan, supra,* 50 Cal.4th at p. 434;
*Bracamontes, supra,* 12 Cal.5th at p. 989.)  The *Nelson* rules do not preclude
courts from questioning the veracity of the People's claims and considering
whether their stated reasons for a charging delay are pretextual or
unsupported by the evidence.  (E.g., *Pellegrino, supra,* 86 Cal.App.3d at
pp. 780–781 [credibility]; *Boysen, supra,* 165 Cal.App.4th at p. 780 [credibility
and evidentiary support].)

*Fourth*, the dissent has misperceived investigative delay to mean delay
attributable to an active, ongoing investigation, or one that is inactive due to
a lack of resources or hitting "a dead end," and not some other reason.  (Dis.
opn., *post*, at p. 16.)  This, too, is an inaccurate understanding of *Nelson*.  As
we have already explained, investigative delay is delay due to the inability of
the prosecution to ethically file charges.  (*Nelson, supra,* 43 Cal.4th at
p. 1256.)  Because of this misunderstanding, the dissent places heavy focus
on the original prosecutor's "personal motivations" (dis. opn., *post*, at pp. 13–
14) for reopening the investigation (his impending retirement) and questions
"whether the delay was truly related to the allocation of scarce resources . . .
as opposed to [the] prosecutor simply choosing not to pursue the case" (*id.* at
p. 11).  The dissent would affirm on the ground that "there was ample
support for the trial court's finding that the combination of the lengthy period
of inaction and the prosecutor's personal motivation to get a conviction before
he retired was *problematic*."  (*Id.* at p. 20, italics added.)  This reasoning not
only relies on the dissent's new test, it misses the mark.

The prosecutor's subjective motivation for *reopening* a criminal
investigation is not relevant.  The relevant question is whether the *delay* is
justified, not the decision to renew the investigation or the ultimate charging

72

decision. In any event, we see nothing wrong with reopening a case to take a fresh look at the investigation. (See *Cowan*, *supra*, 50 Cal.4th at p. 420; *Booth*, *supra*, 3 Cal.App.5th at p. 1309.) We find no impropriety on the part of the original prosecutor in wanting to bring to justice the accomplice to Senser's murder before he retired. As our sister court in *Booth* observed, "it is wholly admirable that [the prosecutor] kept after this case" and those efforts should be "applaud[ed]." (*Booth*, at p. 1309.) Moreover, a prosecutor's decision in this regard is an allocation of resources—an allocation of the prosecutor's time—and is not subject to second-guessing by the judicial branch. (See *Nelson*, *supra*, 43 Cal.4th at p. 1257 ["It is not enough for a defendant to argue that if the prosecutorial agencies had made his or her case a higher priority or had done things a bit differently they would have solved the case sooner."].)

*Fifth*, somewhat inconsistent with its suggestion that *Nelson* should be applied to allow courts to find a due process violation where the delay is simply "problematic" (dis. opn., *post*, at p. 7), the dissent asserts all three of our high court's controlling decisions—*Nelson*, *Cowan*, and *Bracamontes*—are inapposite here because, in its view, this case "does not fit neatly within the confines of the prior cases" (dis. opn., *post*, at p. 3; see also *id*. at pp. 23–25). We are not persuaded. As we have already discussed, the dissent's attempt to distinguish *Cowan* and *Bracamontes* is unavailing because its reading of the facts in these cases is not correct. (See fns. 18 and 20, *ante*.)

Additionally, repeatedly highlighting that the DNA evidence in *Nelson* was "so decisive" (dis. opn., *post*, at pp. 12, 1, 8), the dissent seems to imply *Nelson's* rules are confined to cases involving cold hits, "decisive" DNA evidence, or new advances in technology. To the extent this is the dissent's position, we disagree. Although it is true our high court granted review to

73

address certain "issues arising from prosecutions following . . . DNA 'cold hits' many years after the crime" (*Nelson, supra*, 43 Cal.4th at p. 1247), the court did not say in *Nelson* that the reach of its rules is limited to such cases. Nor did it say so in *Cowan*, when it applied *Nelson* to the reexamination of latent fingerprint evidence, or in *Bracamontes*, when it applied *Nelson* to the use of alternate light source technology. Neither of these cases involved new technology nor, in the case of *Cowan*, even DNA evidence. (See e.g., *Cowan, supra*, 50 Cal.4th at p. 415 [reexamination of latent fingerprint evidence 10 years after the crime]; *Bracamontes, supra*, 12 Cal.5th at p. 987.) Further still, our sister court in *Booth, supra*, 3 Cal.App.5th at page 1293, applied *Nelson's* holding where the investigative *breakthrough* was an incriminating statement obtained 17 years after the murder from a witness authorities tried but failed to interview during the original investigation. Contrary to the dissent's suggestion that the decisive nature of the DNA evidence drove the *Nelson* court's due process analysis, the high court's comment on the decisive statistical rarity of the DNA evidence in *Nelson* should be properly read in context of the other two issues on which the court granted review: whether "the methodology for assessing the statistical significance of a 'cold hit' from a DNA database require proof of general scientific acceptance" and how "the statistical significance of a 'cold hit' from a DNA database [should] be calculated." (*Nelson*, at p. 1249.)

*Finally*, contrary to the dissent's claim that we have created a "new, narrower due process standard" here (dis. opn., *post*, at p. 1), we have faithfully followed *Nelson. Nelson* explains that delay is investigative until the point when "the prosecution believe[s] it ha[s] sufficient evidence to charge [the] defendant." (*Nelson, supra,* 43 Cal.4th at p. 1256.) And *Nelson* holds that "[a] court should not second-guess the prosecution's decision

74

regarding whether sufficient evidence exists to warrant bringing charges" nor "how [it] allocates its resources or how law enforcement agencies could have investigated a given case." (*Ibid*.)

As we have explained, these settled rules are founded on two fundamental principles. First, "a prosecutor has a duty 'to charge only those offenses she believes she can prove beyond a reasonable doubt.' " (*Lopez*, *supra*, 9 Cal.5th at p. 276.) This duty necessarily makes any criminal investigation, from the standpoint of the ability to ethically file charges, incomplete until that point has been reached. Second, the People's independent charging discretion, a cornerstone of our democracy, is not something the judicial branch is free to audit under the circumstances presented here. (*Birks*, *supra*, 19 Cal.4th at p. 134; *Nelson, supra,* 43 Cal.4th at p. 1256.)

The dissent does not discuss these principles, acknowledging only "there is good reason for the courts to defer to a prosecutor's decision as to when to bring charges." (Dis. opn., *post*, at p. 27.) There is more than good reason. To quote our high court again, "prosecuting authorities, exercising executive functions, ordinarily have the sole discretion to determine whom to charge with public offenses and what charges to bring. . . . The prosecution's authority in this regard is founded, among other things, on the principle of separation of powers, and generally is not subject to supervision by the judicial branch." (*Birks*, *supra*, 19 Cal.4th at p. 134.)

In addition to misinterpreting the controlling decisions, the dissent reads credibility determinations and factual findings into the trial court's rulings that are simply not supported by the court's actual statements.

*First*, the trial court's ruling specifically found in three places the delay was "negligent." The dissent ignores these very specific findings and

concludes instead the court meant to fit its ruling into another category of unjustified delay: " 'reckless disregard of circumstances known to the prosecution suggesting that delay might prejudice the defense.' " (Dis. opn., *post*, at pp. 5, 7, italics omitted.) None of these words can be found in the trial court's written ruling. Yet the dissent cites the "reckless disregard" language that *Nelson* quoted from United States Supreme Court cases (*Nelson, supra,* 43 Cal.4th at p. 1253), and asserts the prosecution's decision to reopen and charge McInnis with murder 27 years later was "both arbitrary and done in reckless disregard of known circumstances suggesting [the delay will] prejudice [the defense]." (Dis. opn., *post*, at p. 20.) No such finding can be found in the trial court's written ruling.

The dissent, moreover, identifies no unique or "reckless" circumstance present here that would not be present in any other case. Whenever a prosecutor initially decides there is insufficient evidence for a prosecution to go forward, there is always a risk that evidence will be lost, witnesses will become unavailable, or memories will fade. This may ultimately harm the defense, the prosecution, or both. But that does not transform the prosecutor's ethically required decision not to prosecute into reckless disregard of some future, unknown prejudice to the defendant.

*Second*, the dissent contends we must defer to the trial court's findings that the totality of the "new DNA evidence" was purportedly " 'weak,' " a finding it also claims the People do not challenge on appeal. (Dis. opn., *post*, at pp. 13, 18.) We disagree. The trial court specifically did not question the probative value of McInnis's DNA on the napkin. Just the opposite. At the evidentiary hearing, the court said, *the napkin is the smoking gun*." (Italics added.) And, in its written ruling, the court found the napkin "was a *crucial* piece of evidence that law enforcement would have tested in the mid-1990's

76

had they acted with reasonable diligence." (Italics added.) The dissent ignores this factual finding by the trial court when it concludes the new DNA evidence in this case "simply add[ed] underwhelming circumstantial evidence to an already existing pile." (Dis. opn., *post*, at p. 1.)

But, as we have explained, the trial court erred when it assessed the People's justification for the delay because it improperly removed the DNA evidence on the napkin from consideration of whether there was a change to the state of the evidence. The court improperly removed this "crucial piece of evidence" (the trial court's words) from the equation on the ground that the People could have tested the napkin during the original investigation in 1994. After disregarding the importance of McInnis's DNA on the napkin, the court erroneously considered whether McInnis's DNA on Senser's car seat cover, *standing alone*, changed the state of the evidence in a way that could have affected the prosecution's charging decision. The court did not, as the dissent seems to be saying, conclude the sum of the DNA evidence on the napkin *and* the car seat cover was "weak."

And far from conceding the evidence was "weak," the People argue in their opening brief on appeal that evidence of McInnis's DNA on the car seat cover was the " 'crux' " of their case because it directly placed McInnis inside Senser's car *and* "eliminat[ed] a possible innocent explanation for why [McInnis's] DNA was on the napkin at the scene of the carjacking." In support of this argument, DAI Johnson testified under oath based on his own personal knowledge about the value to the prosecution's case of the additional testing that took place after the DNA results from the napkin. The trial court *disagreed* with the People's assessment of the value of the car seat cover evidence; it did not make an adverse credibility finding. We cannot defer to the court's improper second-guessing of the People's judgment

77

whether the evidence met the quantum of proof it needed to ethically charge a defendant with murder.

*Third*, the dissent asserts the trial court questioned the veracity of the People's representation that they stopped work on the investigation because Bost believed they lacked sufficient evidence in 1994 to prove McInnis's guilt beyond a reasonable doubt. (Dis. opn., *post*, at pp. 16, 18, 21.) We see no such adverse credibility finding in the trial court's ruling. Nor has McInnis even argued this theory as a basis to affirm the trial court's ruling. In its ruling, the trial court (impermissibly) relied on its own personal view that a murder charge should have been brought in 1994, when there was "strong circumstantial evidence" of McInnis's guilt. It did not question the People's good faith belief there was not enough evidence to charge him at the time. This is a new rationale offered for the first time by the dissent.

Here, the dissent contends the trial court's ruling includes adverse credibility findings that are "akin" to the credibility determination made in *Boysen*, *supra*, 165 Cal.App.4th 761. (Dis. opn., *post*, at p. 20.) We disagree. In *Boysen*, unlike here, the prosecution's explanation for delay was found to be unsupported by the evidence and "unconvincing." (*Boysen*, at p. 781.) The prosecution in *Boysen* was unable to "fully reconstruct[ ]" the reasons for the delay in filing charges. (*Id.* at p. 774.) The investigating detective could not remember all the reasons why the district attorney had initially rejected the case for prosecution, and all three copies of the memorandum that memorialized the decision were missing. (*Id.* at pp. 768, 780.)

Against this failure of proof, the *Boysen* court did not find the prosecution's asserted justification for the delay—the discovery of "new fingerprint and forensic evidence"—to be credible. (*Boysen*, *supra*, 165 Cal.App.4th at p. 780; *id.* at pp. 780–781.) The court rejected the

78

prosecution's claim that "new forensic evidence concerning the bullets and cartridges found at the scene and from blood splatter [(sic)] analysis" changed the state of the evidence, and did so on the ground that it did not logically change the prosecution's case against the defendant. (*Id.* at p. 780.) It "merely illuminated *how* the murders occurred and did not point to [the defendant] as the killer." (*Ibid.*, italics added.) The court simply did not believe the prosecution's claim that new fingerprint evidence matching previously unidentified fingerprints to one of the investigating police officers was a significant change in the state of the evidence. (*Id.* at pp. 780–781.) It specifically concluded the asserted justification was "unconvincing." (*Id.* at p. 781.)

Here, by contrast, the trial court disagreed with the People's investigative decisions and assessment of the evidence. There was no adverse credibility finding nor failure of proof at the hearing. As we have just explained, the *Boysen* court did not believe the People's representations about why they decided to file charges when they did, expressly finding them "unconvincing." (*Boysen*, *supra*, 165 Cal.App.4th at p. 781.) By contrast, the trial court here improperly second-guessed the People's investigative decision to not test the napkin for touch DNA during the original investigation. As a result, the court incorrectly took the discovery of that "crucial" evidence out of the equation when assessing whether there had been a change in the state of the evidence when the People decided to file charges. *Boysen* offers no basis to affirm.

Regardless, there is also no evidence in the record to support such an adverse credibility finding even if one had been made. The dissent essentially contends we should interpret the trial court's ruling as a finding that there was something *more* to the People's charging decision that is not

79

explicitly identified in the trial court's ruling. (See dis. opn., *post*, at pp. 16, 20, 26.) But the dissent is just speculating as to the existence of other reasons the People *may* have had not to prosecute McInnis in 1994. There is no evidence of other reasons in the record. The evidence we have on this point is what the prosecutor told the McInnis defense in 1995, when McInnis pled guilty to the Johnston carjacking, and the Thomas jury in 1996: the prosecutor believed he did not have sufficient evidence to prove McInnis guilty of murder. This evidence was admitted as an exhibit at the evidentiary hearing and/or undisputed by the parties. It is not purported "post hoc speculation" by DAI Johnson. (Dis. opn., *post*, at p. 16.) Johnson, in any event, testified without objection that the original prosecutor specifically told him "he felt that more work could be done to identify the second offender." And as McInnis's own attorney put it, the People "tried to implicate" McInnis in the Senser homicide along with Thomas in 1994/1995, but "[t]o this point, they've been unable to do so." Although we are not bound to accept the People's explanations, neither are we permitted to reject them arbitrarily without some evidentiary basis for doing so.

For all these reasons, we find the dissent's interpretation of controlling decisions and the trial court's ruling unpersuasive.

## IV.

### *No* Kellett[23] *Error*

McInnis urges us to affirm the trial court's dismissal order on an alternate ground. In support of his motion to dismiss, McInnis argued the People were barred from prosecuting him for Senser's murder because they had already obtained his conviction for the Johnston carjacking and section

---

[23] *Kellett v. Superior Court* (1966) 63 Cal.2d 822 (*Kellett*).

654 prohibited multiple prosecutions for the same act or course of conduct. The trial court rejected this argument. McInnis contends we should find the bar against multiple prosecution applies and affirm the dismissal on this ground. We decline to do so.

"Whether the bar against multiple prosecution applies [is] determined on a case-by-case basis. . . . We review factual determinations under the deferential substantial evidence test, viewing the evidence in the light most favorable to the prosecution. . . . We review de novo the legal question of whether [s]ection 654 applies." (*People v. Ochoa* (2016) 248 Cal.App.4th 15, 29, citations and fn. omitted (*Ochoa*).)

As a threshold matter, the People contend we do not have jurisdiction to address McInnis's argument because he failed to file a cross-appeal. The People are incorrect. The right to appeal is entirely statutory. An appeal by McInnis after successfully achieving a complete case dismissal would have been unauthorized. (See §§ 1237, 1237.5.) We have authority to consider McInnis's alternative argument to uphold the trial court's dismissal order, and we exercise our discretion to do so. (*People v. Gwillim* (1990) 223 Cal.App.3d 1254, 1258, 1265.)

In *Kellett, supra,* 63 Cal.2d 822, our high court held that "in addition to circumscribing multiple punishments, section 654 establishes an independent rule regarding multiple prosecutions." (*People v. Spicer* (2015) 235 Cal.App.4th 1359, 1372.) The court explained the rule as follows: "When . . . the prosecution is or should be aware of more than one offense in which the same act or course of conduct plays a significant part, all such offenses must be prosecuted in a single proceeding unless joinder is prohibited or severance permitted for good cause. Failure to unite all such offenses will result in a bar to subsequent prosecution of any offense omitted if the initial proceedings

culminate in either acquittal or conviction and sentence." (*Kellett,* at p. 827.)

The facts in *Kellett* presented a very simple case involving a single act. The defendant was arrested for standing on a public sidewalk with a pistol in his hand. He pled guilty to exhibiting a firearm in a threatening manner. One month later, based on the same act, he was charged with possession of a concealed weapon by a felon. The Supreme Court held the first conviction prohibited the later prosecution. (*Kellett*, *supra*, 63 Cal.2d at p. 824.)

To address more complicated fact patterns, appellate courts have since adopted two different tests under *Kellett* to determine whether multiple offenses occurred during the same course of conduct. (*Ochoa, supra,* 248 Cal.App.4th at p. 28.) The first test, the " 'time and place' " test, is not at issue here because McInnis does not contend it applies. (*Id.* at p. 29; see *id.* at pp. 28–29.) The second test, the " 'evidentiary test,' " looks to the evidence necessary to prove the offenses." (*Id.* at p. 29.) Under this test, "if the evidence needed to prove one offense necessarily supplies proof of the other, . . . the two offenses must be prosecuted together, in the interests of preventing needless harassment and waste of public funds." (*People v. Hurtado* (1977) 67 Cal.App.3d 633, 636 (*Hurtado*).)

Under the evidentiary test, McInnis contends the People are barred from prosecuting him for Senser's murder, because they charged him with the Johnston carjacking in 1994 and obtained a conviction when he pled guilty in

1995.[24]  Without providing meaningful detail, he contends the evidence used to hold him over in the prior case is needed to prove him guilty in the instant case.

We agree with the trial court's ruling and analysis.  The court acknowledged there was a "strong logical connection between the Johnston and Senser incidents," and that "[b]oth events involved similar modus operandi and occurred in the same general area within two days."  However, while there was an evidentiary overlap between the two cases, the court found the evidence needed to prove one offense did not necessarily supply proof of the other.  (*Hurtado, supra,* 67 Cal.App.3d at p. 636.)

As noted, McInnis did not supply us with specifics regarding the particular evidence from the Johnston carjacking that is purportedly needed to prove Senser's murder.  The evidentiary test "requires more than a trivial overlap of the evidence.  Simply using facts from the first prosecution in the subsequent prosecution does not trigger application of *Kellett*."  (*People v. Valli* (2010) 187 Cal.App.4th 786, 799.)  We decline to uphold the trial court's dismissal order on this alternate ground.

## DISPOSITION

The trial court's order dismissing the action is reversed and the case is remanded for further proceedings.  If the People choose to proceed after the case is reinstated, the court is directed to reopen the evidentiary hearing to

[24]    Neither in the trial court nor on appeal does McInnis contend the People are barred from prosecuting him for Senser's murder because they previously charged him as an accessory after the fact to that murder.  Nor could he.  The prohibition against multiple prosecutions based on the same act or course of conduct applies only in the case of an "acquittal" or "conviction and sentence."  (§ 654.)  Here, the accessory-after-the-fact charge was dismissed pursuant to a plea bargain.

conduct the third step of balancing the prejudice to McInnis against the People's strong justification of investigative delay.  The court shall allow McInnis the opportunity to present evidence that the prejudice to his defense has been compounded by any changed circumstances during the pendency of this appeal.  The court shall then reconsider whether pretrial dismissal is appropriate after properly balancing the harm to McInnis against the People's justification for the delay and considering possible alternative remedies to mitigate the prejudice.


DO, Acting P. J.

I CONCUR:


BUCHANAN, J.

Kelety, J., Dissenting.

DNA analysis is undoubtedly a groundbreaking tool in criminal investigations. It can be the "break" in a case that would otherwise remain unsolved, providing decisive new evidence, as it did in *People v. Nelson* (2008) 43 Cal.4th 1242 (*Nelson*). But in other instances, like the case at hand, DNA evidence does not truly "solve" the case. It simply adds underwhelming circumstantial evidence to an already existing pile.

Relying primarily on *Nelson*, the majority concludes the trial court in this case abused its discretion when it determined the prosecution's stated reliance on two additional pieces of DNA evidence did not provide strong justification for the nearly 27-year delay in charging Leon Daniel McInnis. I disagree with the majority's interpretation of *Nelson* and the majority's characterization of the trial court's decision in this case.

Considering the entire 15-page decision of the court under the applicable standard of review, it is apparent that the trial court understood the applicable legal framework and considered the totality of circumstances in evaluating whether McInnis could receive a fair trial despite the lengthy delay. Although the trial court here reached a different result than in *Nelson*, it did so based on specific factual findings that differentiate this case from *Nelson* and many of the other cases discussed in the majority opinion.

In reaching the opposite conclusion, I believe the majority reads *Nelson* and its progeny too narrowly and, as a result, constructs a new, narrower due process standard. The majority suggests that *Nelson* requires trial courts to find that a prosecutor's stated justification for the delay is investigative only, and thus strong as a matter of law, so long as the prosecution can point to some new evidence and subjectively claim that it supports their charging decision. In applying this strict framework, the majority overlooks the

totality of circumstances and key factual findings made by the trial court in this case.

In addition, it is imperative that this court provide trial courts with clear guidelines regarding the legal standards they must apply. In my view, the majority opinion falls short of achieving that goal. The majority simultaneously asserts that the prosecutor's stated reasons for the charging decision are not unimpeachable, but yet the trial court cannot "second-guess" that same decision. It is not clear to me from the majority's discussion how and when a court crosses the line into impermissible second-guessing. I write separately, in part, to set forth my view of the relevant legal authority, which not only permits, but requires, trial courts to conduct a comprehensive fact-based inquiry, considering the particular circumstances of each individual case, and balancing justification and prejudice on a continuum, rather than in a strict binary fashion. (*Nelson, supra,* 43 Cal.4th at p. 1253; *United States v. Marion* (1971) 404 U.S. 307, 325 (*Marion*); *United States v. Lovasco* (1977) 431 U.S. 783 (*Lovasco*).)

Finally, I disagree with the majority's disposition. To the extent the majority concludes the trial court abused its discretion by improperly second-guessing the prosecutor's stated view of the evidence or allocation of investigatory resources, the proper remedy is a full remand to the trial court. The majority's assertion that the trial court must conclude that the delay was investigative only and that the People's justification was therefore entitled to strong weight as a matter of law is reflective of the rigid nature of the framework the majority applies. The trial court should instead be afforded the opportunity to conduct a complete re-balancing, considering all relevant facts and circumstances, under the appropriate legal framework. (See *People*

*v. Dain* (2025) 18 Cal.5th 246, 259–263 [an open-ended remand is ordinarily the appropriate remedy when trial court abuses its discretionary power].)

### Analysis of the Asserted Justification for Precharging Delay Requires a Case-specific, Fact-based Inquiry

Before delving into the legal standards governing the trial court's analysis of the prosecutor's asserted justification for the delay, I begin with a brief discussion of the context in which this analysis takes place.

The basic question that the trial court must answer is whether the defendant can receive a fair trial when the prosecutor decides to charge a case many years after the charged offense(s) occurred. (*Nelson, supra,* 43 Cal.4th at p. 1255 ["The ultimate inquiry in determining a claim based upon due process is whether the defendant will be denied a fair trial."].) The framework for making that determination has been developed over time in the context of a handful of key cases.

This case, like many others in which the courts must consider the impact of a lengthy delay in prosecution, is undoubtedly complex. It required the trial court to apply general legal principles that have been developed over time in a constantly changing scientific environment, and in the context of the specific factual scenarios presented in each case. Our understanding of both law and technology has continued to evolve, and as is often the case, the factual scenario presented here does not fit neatly within the confines of the prior cases. However, in each case, the trial court must conduct a comprehensive fact-based inquiry, and under the applicable standard of review, we must generally defer to the trial court's factual findings. (See *People v. Cowan* (2010) 50 Cal.4th 401, 431 (*Cowan*).)

The majority seems to apply a rigid framework, requiring the courts to compartmentalize the types of precharging delay into one of three categories: tactical, negligent, or investigative; and then to assign a predetermined, fixed

weight (none, weak, or strong) to use in balancing justification with prejudice. In my view, this approach precludes a more nuanced view of the totality of circumstances at play in any given case. I believe the courts should be guided by a more holistic approach in which they consider all relevant evidence to determine whether the prejudice resulting from the delay is adequately justified and, ultimately, whether the defendant can still receive a fair trial. (See, e.g., *Marion, supra,* 404 U.S. at p. 325 ["To accommodate the sound administration of justice to the rights of the defendant to a fair trial will necessarily involve a delicate judgment based on the circumstances of each case"].)

### The *Nelson* Court's Discussion of "Negligence"

I turn now to *Nelson*. The majority characterizes *Nelson* as the landmark case addressing preaccusatory delay under California law. While I agree that *Nelson* sets forth the most recent comprehensive discussion on the topic, I note that the *Nelson* court's stated intent was to address several emerging issues surrounding the revolutionary scientific discovery of DNA evidence in "cold cases." (*Nelson, supra,* 43 Cal.4th at p. 1247.) The court began by pointing out the strength and pivotal nature of the DNA evidence that precipitated the charges, stating that the odds that someone other than the defendant left the semen collected from the victim's clothing was "one in 930 sextillion (93 followed by 22 zeros)." (*Ibid.*) The court characterized this evidence as "tantamount to saying that defendant left the evidence at the crime scene." (*Ibid.*) The court then explained that it "granted review to decide issues arising from prosecutions following such DNA 'cold hits' many years after the crime." (*Ibid.*)

One of those issues was the impact on the defendant's rights to due process and a fair trial. As the majority observes, the *Nelson* court clarified

4

that a defendant's preaccusatory due process rights under the California Constitution are at least as favorable, if not more so, than under the United States Constitution. (*Nelson, supra*, 43 Cal.4th at p. 1251.) The *Nelson* court then discussed two United States Supreme Court cases, *Marion, supra,* 404 U.S. 307 and *Lovasco, supra,* 431 U.S. 783.

The Court in *Lovasco* "stressed that 'the Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment.' " (*Nelson*, *supra*, 43 Cal.4th at p. 1252.) However, courts are nevertheless required to determine whether a precharging delay violates fundamental concepts of justice and fair play. (*Lovasco, supra,* 431 U.S. at p. 790.) In addressing that question, the *Lovasco* court noted there are many legitimate reasons to delay prosecution, and that " 'investigative delay is fundamentally unlike delay undertaken . . . "to gain a tactical advantage." ' " (*Nelson* at p. 1252.) This is where the concept of "investigative delay" comes from.

However, as the *Nelson* court noted, *Lovasco* and *Marion* "indicated that delay undertaken to gain a tactical advantage over the accused, *or delay incurred in reckless disregard of circumstances known to the prosecution suggesting that delay might prejudice the defense*, would violate due process if the defendant demonstrates prejudice," and left "open the possibility that delay might be unjustified in other circumstances as well." (*Nelson, supra,* 43 Cal.4th at p. 1253, italics added.)

After discussing these federal cases, the *Nelson* court turned to development of the law regarding justification in California. (*Nelson, supra,* 43 Cal.4th at p. 1254.) It noted that, under California law, " 'A "legitimate reason" [for precharging delay] logically requires something more than the absence of governmental bad faith.' " (*Ibid*.) If the defendant's right to a fair

trial is impaired by an "unjustified delay by the prosecution coupled with prejudice, it makes *no difference* whether the delay was deliberately designed to disadvantage the defendant, or whether it was caused by negligence of law enforcement agencies or the prosecution. In both situations, the defendant will be denied his right to a fair trial as a result of governmental conduct." (*Id.* at p. 1255, italics added.)

"[W]hether the delay was purposeful or negligent" is however still relevant, because "[i]f the delay was merely negligent [i.e., not purposeful], a greater showing of prejudice would be required to establish a due process violation." (*Nelson, supra,* 43 Cal.4th at pp. 1255–1256.) In other words, the trial court must determine where the prosecution's justification for the delay lands on a scale ranging from purposeful (no justification) to legitimate (strong justification), and then balance that against the resulting prejudice, to determine if the defendant has been denied the right to a fair trial.

As the majority notes, the *Nelson* court does not explicitly define negligence. In my view, the *Nelson* court's use of the phrase "merely negligent" and the preceding discussion of the development of the law suggests that the *Nelson* court used the term "negligence" broadly, and primarily as a shorthand to reference forms of delay that may not be

6

purposeful but are nevertheless problematic.[1] This category includes "delay incurred in reckless disregard of circumstances known to the prosecution suggesting that delay might prejudice the defense," and "other" forms of unjustified, but not purposeful delay. (*Nelson, supra,* 43 Cal.4th at p. 1253.)

The majority offers its own explanation of the difference between investigative and negligent delay, focusing primarily on periods of *unexplained* delay, which they define as delay that occurs *after* the People acknowledge that they (subjectively) have sufficient evidence to charge the case. The majority states that such *unexplained* delay may "ripen into negligence." By contrast, delay that is "explained" is *not* negligent, and delay is "explained" so long as the prosecutor points to some new evidence and asserts it provided them with sufficient basis to charge the case. In such cases, the majority appears to conclude the trial court *must* find that the justification is strong.

As the majority concedes, had the prosecutor reopened this case and "decided to file charges right away, based on 'a good faith re-evaluation of the *same evidence*' [citation], it would be inappropriate to categorize the delay as investigative delay." But, since the prosecutor asserted the additional DNA results provided sufficient evidence to charge the case, the majority concludes

---

[1] To be clear, I do not suggest the *Nelson* court's analysis was in any way incomplete or cavalier. Rather, as the majority states, the *Nelson* court did not provide a clear definition of the term "negligence," but it did provide a detailed discussion of the evolution of both the state and federal law surrounding potential asserted justifications for delay. At a minimum, the *Nelson* court made clear that a legitimate, or strong, justification requires something more than the absence of bad faith; and that "negligent" delay could result in a due process violation, but that it would require "a greater showing of prejudice" than "purposeful" delay. (*Nelson, supra,* 43 Cal.4th at pp. 1254–1256.) Thus, negligent delay falls somewhere between investigative and purposeful in terms of the associated strength of justification.

the delay was necessarily "investigative and entitled to strong weight in the third step balancing test."

The majority reaches this conclusion based on an assertion that "*Nelson* explains that the delay is investigative until the point when 'the prosecution believe[s] it ha[s] sufficient evidence to charge [the] defendant." I do not think that the court in *Nelson* drew such a line. Rather, in the portion of the opinion that the majority quotes, the *Nelson* court accepted the prosecution's assertion that it had sufficient evidence to charge Nelson only after it had received the DNA results, based on the decisive evidence in that case. At the same time, the *Nelson* court acknowledged delay caused by negligence of law enforcement agencies "in gathering evidence" or the district attorney "in evaluating a case for possible prosecution" could result in a deprivation of due process in some cases. (*Nelson, supra,* 43 Cal.4th at pp. 1254–1255.)

By limiting negligence to the period *after* the People assert they believed there was sufficient evidence to charge the case, and then severely limiting the trial court's ability to examine the People's assertion without improperly second-guessing, the majority also severely limits the trial court's ability to examine whether the delay was negligent. In my view, the trial court must conduct a complete fact-based inquiry of the prosecution's stated justification in each case, considering all relevant circumstances. (See *Nelson, supra,* 43 Cal.4th at p. 1253; *Marion, supra,* 404 U.S. at p. 325; *U.S. v. Gross* (2001) 165 F.Supp.2d 372, 385 (*Gross*) ["every court has recognized that these determinations are fact-based inquiries which turn on the circumstances particular to each individual case"].)

The majority subsequently states that the People's assertions regarding the evidence are not unimpeachable and that courts can consider whether

8

they are pretextual or unsupported by the evidence; but at the same time, it reiterates that the courts *are* prohibited from "second-guessing" those same decisions, without clearly articulating the difference. And here, the majority finds the trial court erred by concluding the DNA result from the car seat cover was of minimal probative value, and therefore offered minimal, if any, justification for the delay. As I discuss in more detail, *post,* I believe the trial court appropriately found the prosecutor's assertions about the evidence unsupported, and the associated justification unconvincing.

### The *Nelson* Court's Analysis Of the Prosecutor's Stated Justification

I turn next to the *Nelson* court's analysis of the prosecutor's asserted justification for the delay. But first, it is important to note the procedural posture. Like many of the other key cases addressing precharging delay, the court in *Nelson* was reviewing a judgment in which the trial court had *denied* the defendant's motion to dismiss. Accordingly, the standard of review required the reviewing court to view the record and make all reasonable inferences in favor of that *denial*. The opposite is true here.

The court in *Nelson* concluded that "[t]he delay was investigative delay, *nothing else*," and accordingly, that the justification was strong. (*Nelson, supra,* 43 Cal.4th at p. 1256, italics added.) Although the police had considered Nelson as a suspect back in 1976, they were unable to conclusively link him to the murder. Once DNA testing became available, the state allocated resources to utilize it "to solve sexual assault cases that lacked suspects," including the murder for which Nelson was later convicted. (*Id*. at p. 1248.) When the available biological evidence—semen from the victim's clothing—was tested, it resulted in a very strong match to Nelson. (*Id*. at p. 1249.) At that point, the state had sufficient evidence to charge Nelson. (*Id*. at p. 1257.)

9

After noting the "police may have had some basis to suspect [Nelson] of the crime shortly after it was committed," the *Nelson* court explained the police did not fully solve the case until the DNA testing in 2002. (*Nelson, supra,* 43 Cal.4th at p. 1256.) In that context, it cautioned, "court[s] should not second-guess the prosecution's decision regarding whether sufficient evidence exists to warrant bringing charges." (*Ibid.*)

Notably, Nelson did not assert the state had enough evidence to charge him in 1976, or that the recently discovered DNA match was not strong enough to fully explain the charging decision in 2002. (*Nelson, supra,* 43 Cal.4th at p. 1256.) Instead, Nelson argued the relevant technology existed for years before the state made the relevant comparison, and that the state could have obtained the DNA evidence sooner. (*Ibid.*)

In response to *that* argument, the *Nelson* court explained the difficulty in allocating scarce prosecutorial resources may justify a delay, and that, "It is not enough for a defendant to argue that if the prosecutorial agencies had made his or her case a higher priority or had done things a bit differently they would have solved the case sooner."[2] (*Nelson, supra,* 43 Cal.4th at p. 1257.) Of course, in *Nelson*, the only thing the state arguably could have done differently would have been to place one "cold case" above another in line for testing.

Thus, in my view, the court in *Nelson* cautioned: 1) a trial court should not make its own determination that the prosecutor should have charged the case sooner, *at some point in the past*; and 2) where the prosecution provides

---

[2]    Notably, the *Nelson* court relied on *People v. Dunn-Gonzalez* (1996) 47 Cal.App.4th 899 in this portion of their opinion. In that case, the prosecutor offered detailed testimony regarding the caseload of the office and difficulties encountered in sharing workload across two counties during the relevant two-year delay. (*Id.* at p. 914.)

evidence that the delay was at least partially attributable to the state's allocation of scarce resources, the trial court should not second-guess the decisions of the stakeholders in allocating those resources.

This does not mean that the trial court cannot consider the relative strength of any "new" evidence (i.e., whether the prosecutor's asserted reason to charge *now* is pretextual), or whether the delay was truly related to the allocation of scarce resources (as opposed to a prosecutor simply choosing not to pursue the case). It is not enough for a prosecutor to simply state that they were generally busy with other cases. (See, e.g., *Dickerson v. Superior Court* (2019) 40 Cal.App.5th Supp. 1, 12 (*Dickerson*) ["There was absolutely no evidence submitted to the trial court to support the prosecution's contention," but only "the prosecutor in each case citing numbers that might reflect that the charging deputy district attorneys are, at times, overwhelmed by the workload."]; *Nelson, supra,* 43 Cal.4th at p. 1254 [" 'A prosecutor is entitled to *reasonable* time in which to investigate an offense for the purpose of determining whether a prosecution is warranted.' " (italics added)].)

Likewise, I do not read *Nelson* to suggest that a court cannot look beyond a prosecutor's stated reason for filing charges *when they did*, or that the court must conclude the justification is strong any time the prosecutor points to *any* new evidence. Rather, the court in *Nelson* found the justification *in that case* was strong because it was a simple, straightforward case in which the state solved a true "cold case" by processing DNA evidence in a routine manner once the necessary technology and funding became available. Under those circumstances, the delay was investigative *only*, and "nothing else." (*Nelson, supra,* 43 Cal.4th at p. 1256.)

The *Nelson* court's admonition against courts second-guessing a prosecutor's prior decision *not* to charge a case in the past does not mean that

11

the trial court cannot analyze the prosecutor's stated reason for deciding to charge a case *now*. (See *Nelson, supra,* 43 Cal.4th at p. 1256 [noting the police may have had some basis to suspect the defendant shortly after the crime was committed]; *Cowan, supra,* 50 Cal.4th at p. 435 [discussing defendant's assertion that "the prosecution had enough evidence to arrest him in early 1985"].) Rather, the trial court should consider all relevant evidence, while also giving the appropriate deference to the prosecutor's role. (See, e.g., *Dickerson, supra,* 40 Cal.App.5th at p. Supp. 12 [trial court erred by relying solely on attorney argument].)

Other cases, like this one, are not as straightforward as *Nelson*. Motivations can be mixed, and the evidence may reveal that there was more than one explanation for the delay. *Nelson* does not foreclose the possibility that, in a different case, there could be some new evidence (of minimally probative value), and also some other circumstances indicating the delay was not purely investigative. In other words, just because the prosecutor makes some effort to find or analyze some additional evidence does not mean that the trial court cannot consider *other* circumstances that may *also* be relevant to the intervening delay, or that the justification will *always* be as strong as it was in *Nelson*. Nor does *Nelson* require other courts to strictly categorize the delay as *entirely* investigative, entirely negligent, or entirely tactical and then assign a strict weight based on that category.

Because the newly discovered DNA evidence in *Nelson* was so decisive, and because there was nothing in the record to suggest the prosecutor had any other motive, the justification for the delay *in that case* could be neatly characterized as investigative *only*, with strong justification. But that does not mean that all prosecutorial decisions can be, or should be, so rigidly compartmentalized. By drawing a line at the point where the prosecution

12

obtains at least one last piece of arguably relevant evidence to distinguish between investigative (or explained) delay and negligent (or unexplained) delay, the majority appears to create a more narrow framework, based primarily on the prosecutor's subjective assertion that a given piece of evidence now tips the scales in favor of prosecution. In fashioning this new framework—and in concluding the trial court violated it—the majority overlooks unique facts that the trial court permissibly relied on in this case to reject at least some of the prosecutor's assertions.

I do not believe the framework guiding the trial court's analysis is so binary. A court should not be forced to suppress its skepticism and accept the prosecutor's subjective assertions, while ignoring evidence that the scales may also have tipped because of diminished defense evidence, i.e., "*circumstances known to the prosecution suggesting that delay might prejudice the defense.*" (*Nelson, supra,* 43 Cal.4th at p. 1253, italics added.) Rather, where a trial court determines, based on the totality of evidence, that the precharging delay is not fully explained by the prosecutor's asserted justification, or that there are other relevant facts or circumstances, it may conclude that the justification falls somewhere closer to "negligent" than "investigative." This is particularly true in cases like the one at hand, where the intervening delay is extremely lengthy.

Here, there is no dispute there was some new DNA evidence, but the trial court found at least some of that evidence—the final piece that allegedly justified the charges—to be of minimal probative value, a finding that the People do not challenge on appeal. The trial court also found there was a lack of evidence explaining the lengthy delay *before that point*; that "law enforcement did nothing on the case for a remarkable 22 years"; and that there was evidence the prosecutor was influenced by his own personal

13

motivations. Accordingly, the totality of evidence in *this* case shows that the asserted justification does not fit so neatly into the category of purely investigative delay. (See*, Gross, supra*, 166 F.Supp.2d at p. 384 [finding no investigatory delay where "the Government's failure to act was evidenced by large gaps of time with no case activity whatsoever"].)

The majority acknowledges the possibility of such a hybrid type of case, where the prosecutor may engage in non-investigative, or unjustified, delay that unreasonably risks harm to the defendant's defense while also accumulating some additional evidence to support the eventual filing of charges. However, the majority summarily concludes that the present case does not require us to consider such circumstances. As I explain next, I believe the trial court disagreed. The majority's application of its narrow framework impairs a complete understanding of the nuance in the trial court's ruling.

### The Trial Court Did Not Misunderstand or Misapply Any Relevant Principles of Law

Turning to the trial court's decision in this case, the majority asserts the trial court misapplied *Nelson*, incorrectly found negligence, and should have instead concluded that the justification for the delay was investigative only and therefore entitled to strong weight. I do not believe that the majority accurately describes the trial court's analysis.

The trial court began its analysis of the asserted justification for the delay by noting that, "The People argue that advances in DNA testing necessitated the delay of nearly 27 years between crime and complaint. However, *the testimony at the evidentiary hearing contradicts that claim*." Thus, it is apparent that the trial court was responding to that argument. In that context, the court noted that one of the experts, Dr. Elizabeth Johnson, testified that the napkin could have been tested in 1994. The court

14

acknowledged the testimony from the competing expert, that the lab focused primarily on visible sources of DNA in 1994, but noted that the expert also said, "although he would not have normally analyzed the napkin in 1994, *he would have done so if requested to do so*," because napkins were known to be a common source of DNA.

The court went on to state that the "napkin wrapped around the knife was a crucial piece of evidence that law enforcement would have tested in the mid-1990s had they acted with reasonable diligence." The majority relies on this statement to assert the trial court improperly second-guessed how the state *could* have investigated the case. However, both the statements in *Nelson* and by the trial court here must be read in context.[3]

As I have explained, the *Nelson* court stated that courts "may not find negligence by second-guessing how the state allocates its resources or how law enforcement agencies could have investigated a given case," in the context of Nelson's assertion that the state should have tested his DNA sooner. (*Nelson, supra,* 43 Cal.4th at p. 1256.) But there, the state explained that it had received funding to conduct DNA testing in sexual assault cases, that the county had about 1,600 unsolved sexual assault cases at the time, and that the case was "put in line" with the rest for DNA testing. (*Id.* at pp. 1248–1249.) Thus, in *Nelson*, the prosecution presented evidence the delay was due to actual resource allocation issues. The court was simply

_____

[3] Although the trial court used the word "crucial" here, it is apparent the court's purpose was to point out that the People had potentially probative evidence available for testing when they stopped pursuing the case in the mid-1990s. As we discuss below, the People concede the DNA results on the napkin obtained over 20 years later did not directly connect McInnis to the murder. (Cf. *Nelson, supra,* 43 Cal.4th at p. 1247 [DNA evidence was "tantamount to saying that defendant left the evidence at the crime scene"].)

15

rejecting the assertion that the state should have tested one sample before another.

Here, as the majority notes, McInnis was the only viable second suspect, and the prosecution continued to pursue a case against him as late as October 1995. Indeed, his plea was structured to allow the People to continue that investigation. But the prosecutor, David Bost, was also prosecuting Thomas, and that trial began in January 1996. When Thomas claimed McInnis was the killer, Bost responded by telling the jury he did not have enough evidence to convict McInnis. Thereafter, it appears the prosecution stopped pursuing McInnis.

This raises at least an inference that the prosecution stopped pursuing McInnis in favor of prosecuting Thomas, or perhaps because Bost had secured a conviction against Thomas. This is not a case, like *Nelson*, where the prosecution simply hit a dead end. Indeed, district attorney investigator Johnson testified there was no record of any attempt to work on the case from 1996 to 2018, nor was there any record of anyone refusing to conduct further testing. The only evidence of the reason for the sudden stop in pursuing McInnis was Johnson's post hoc speculation in 2023 that there was simply nothing more to do. As the trial court concluded, despite significant circumstantial evidence implicating McInnis, "law enforcement did nothing on the case for a remarkable 22 years."[4]

---

[4] The majority asserts the trial court was criticizing the People's decision not to charge the case in 1994 when it noted substantial circumstantial evidence implicated McInnis then. I see nothing in the trial court's written order criticizing the People's decision not to charge the case in 1994. Rather, the court was commenting on the strength of the circumstantial case against McInnis just prior to the lengthy unexplained period of inactivity. The record supports the trial court's findings, and the People do not dispute them.

Although it is not part of the written order, the discussion on the record at the end of the evidentiary hearing illuminates the trial court's analysis. The court asked counsel to address one last question: Whether the timeline suggested negligence. He said, "In 1996, there was a trial. Thomas was convicted. They took the file. They put the file somewhere, on somebody's desk. Nobody looked at it until 2018. Nobody looked at it. It just – nobody thought about it. Nobody cared about it. It wasn't an issue. It's just Thomas went away. Nobody cared about McInnis." When the trial court said, "law enforcement's negligence for decades precludes a finding of justification," this is what it meant; despite believing McInnis was the second suspect and having potentially crucial evidence available to test, the prosecution simply stopped. Then, in 2023, the prosecution failed to offer evidence establishing a valid reason for the sudden stop or the intervening 22-year delay.

Regardless, the People have repeatedly asserted that the DNA on the napkin wrapped around the knife found at the scene of the carjacking "was insufficient to directly connect [McInnis] to the murder or the victim's vehicle. As defense counsel noted at the motion hearing, there are a myriad of innocent explanations about why the napkin with [McInnis's] DNA (item #13) was at the scene of the carjacking." For example, Thomas could have picked up a napkin (and the knife) from the table at the apartment where McInnis was shortly before the carjacking. Accordingly, by the People's own admission, "the napkin was never enough to get us beyond a reasonable doubt." It certainly was not the compelling kind of DNA evidence at issue in *Nelson*.

This brings us to the second piece of evidence that allegedly supported the *current* charging decision: The DNA results from the passenger side seat cover from victim Senser's recovered vehicle. The trial court acknowledged

17

that this DNA evidence could not have been obtained in 1994. The trial court noted that the relevant technology became available in the early 2000's, and that the "People rely upon resource constraints to explain the delay in testing from the early 2000's to the seat cover's 2019 testing." It acknowledged that *Nelson* supported the argument and counseled against second-guessing the state's allocation of resources but stated that the argument "ignores the minimal probative value of the seat cover's DNA result."

The court explained that the "low likelihood ratio does not place [McInnis] in victim Senser's car with any reasonable level of certainty and does not markedly alter the balance of evidence against [McInnis]. Indeed, the People waited nearly two years after obtaining this result before filing charges. Put simply, this weak DNA finding offers minimal, if any, justification for the nearly 27-year delay."

The trial court's finding was supported by substantial evidence. Dr. Elizabeth Johnson testified that it was possible to transfer DNA from an object, such as a jacket, and that the new test kits were sensitive enough to detect small amounts of DNA from such transfers. Thus, the result did not conclusively place McInnis in the car, and most certainly not at the time of the murder. In 1994, Thomas's girlfriend, T. Jackson, had said McInnis and Thomas returned to her apartment, together, at 4:00 a.m., that they were talking about a car, and that she heard a car idling outside. Thus, there already was some evidence, in 1994, that McInnis had been in the car with Thomas at some point *after* the murder. The DNA on the seat cover did not conclusively place McInnis in the car before the murder. It was nothing like the DNA evidence in *Nelson*, which definitively placed the defendant's semen on the victim's clothing.

After discussing the minimal probative value of this new evidence, the trial court turned to the circumstantial evidence that was available nearly 27 years earlier. By doing so, the trial court was not second-guessing the prosecution's decision not to bring a case back in the 1990's or the state's allocation of resources between 1996 and 2019. Rather, the court was suggesting that the combination of the strong circumstantial evidence back then, together with the minimal probative value of the new DNA evidence, undermined the prosecutor's assertions that the delay was investigatory and that the new DNA evidence tipped the scales.

The majority asserts the trial court was not permitted to comment on the evidentiary value of the DNA evidence, and instead should have deferred to the prosecutor's assertion that it provided a sufficient basis to charge the case, but again, I see nothing in *Nelson* that precludes the trial court from considering all circumstances, including the strength of the evidence the prosecutor purports to rely on. As the majority seems to concede, courts may consider "whether [the prosecution's] stated reasons for a charging delay are pretextual or unsupported by the evidence." Here, the court listened to the expert testimony and determined the evidence supported a finding that the DNA on the car seat was of minimal probative value. I see no error in that specific factual finding, or the court's reliance on it.

Moreover, the record is clear: The DNA testing was done in 2018 only because Bost, the deputy district attorney who had prosecuted Thomas back in 1996, asked investigator Johnson to perform additional work on the case. Johnson did not go through the typical channels to place the case on a priority list—he volunteered, as a favor to Bost. He explained that Bost "wanted to do this case and then retire." And again, although Johnson speculated as to why the case originally stalled, there is nothing in the record

19

to suggest that he had any firsthand knowledge of why the investigation stopped, or why it was not reinstated until 2018.  The trial court did not improperly second-guess the state's allocation of resources; the prosecution did not establish a resource allocation issue.

In my view, there was ample support for the trial court's finding that the combination of the lengthy period of inaction and the prosecutor's personal motivation to get a conviction before he retired was problematic. Although the term "negligent" is not well defined, there was evidence here suggesting that Bost's decision to stop pursuing the case in 1995, and then to reopen and charge the case 27 years later, was both arbitrary and done in reckless disregard of known circumstances suggesting prejudice to McInnis.

At a minimum, the totality of evidence does raise an inference, consistent with the trial court's ruling, that the delay was not investigative *only*.  Trial courts routinely consider the full circumstances of the case when analyzing the prosecution's asserted justification for the delay.  (See *Dickerson, supra,* 40 Cal.App.5th at p. Supp. 12 [rejecting prosecutor's argument the delay resulted from the allocation of scarce resources]; *Gross, supra,* 165 F.Supp.2d at p. 385 ["The Court further finds that the delay was caused by the Government's failure to act in prosecuting these charges. Moreover, the Government's explanations do not reveal any legitimate investigatory reason for the delay or serve to otherwise justify the prejudice suffered by Defendants."].)  And that is what the trial court did here.

**The Trial Court's Decision Is Consistent With *Boysen***

I also agree with the trial court's conclusion that this case is akin to *People v. Boysen* (2007) 165 Cal.App.4th 761 (*Boysen*).  Notably, *Boysen* is one of the few cases in which the appellate court was reviewing the trial court's decision to *grant* a motion to dismiss based on precharging delay.  (*Id*. at

20

p. 765.) As here, the standard of review and procedural posture required the appellate court to accept the factual determinations of the trial court and draw all reasonable inferences in favor of the judgment.

In *Boyson*, the district attorney asserted that the break in the case after a 22-year delay was "new fingerprint and forensic evidence." (*Boysen, supra,* 165 Cal.App.4th at p. 780.) The court determined the prosecutor's assertion was not credible because the new evidence "did not point to [Boysen] as the killer." (*Ibid.*) Notably, the court did not make an overt credibility finding; rather, it commented on the strength of the forensic evidence, and concluded it provided no new insight as to the perpetrator. (*Boysen,* at p. 781.) The additional fingerprint evidence—matching fingerprints at the scene of the crime to a sergeant that investigated the murder—was "useful but does not in the least foreclose the possibility that someone else, perhaps gloved, also came through [the scene]." (*Ibid.*) Thus, although the prosecutor pointed to some new evidence and asserted that he believed it justified bringing the charges, the court looked past that subjective statement, and determined, based on the totality of evidence, that the prosecutor's stated reliance on new evidence did not justify the delay.

The same is true here. The evidence the prosecution relied on did not point to McInnis as the killer. It proved only that objects he had touched ended up at the scene of the carjacking and in the stolen car, all of which could be explained by his relationship with Thomas. The trial court therefore determined the evidence was of minimal probative value (just like the new fingerprint evidence in *Boysen*) and did not support the prosecutor's subjective statement that the *current* charging decision was based entirely on new evidence. The trial court could have made a more direct credibility finding, but it was not required to do so. I believe this is what the court

21

meant when it concluded "this weak DNA finding offers minimal, if any, justification for the nearly 27-year delay." To the extent the majority asserts the trial court did not make a credibility finding, or that the trial court's analysis of the new evidence in this case differs in a material way from the analogous analysis in *Boysen*, the trial court should be afforded the opportunity to clarify that ruling on remand.

The majority asserts that *Boysen* is distinguishable because the decision there was based on a failure of proof as to why the prosecutor declined to charge the case 22 years earlier. First, the same is true here. There was no direct evidence of the prosecutor's rational for ending the investigation in this case in 1996. The prosecutor did not testify, nor did anyone, other than the lab technicians, who had worked on the case in the 1990's. While Johnson did review the file, he could only speculate on what he *thought* might have happened. It is clear from the trial court's ruling that it did not give significant weight to Johnson's speculative explanation.

Regardless, I do not believe that was the true basis of the holding in *Boysen*. Rather, as the court explained: "The district attorney's claims of justification for that delay are unconvincing. In 1982 the district attorney's office, faced with a case they might or might not have been able to prove, made a decision not to prosecute [Boysen]. *That decision was within the prosecution's prerogative. We attribute no bad faith to the district attorney*; however, it is clear what has changed in the past 24 years *is not the evidence but the willingness to proceed*." (*Boyson, supra,* 152 Cal.App.4th at p. 781, italics added.) As the majority explains, "The court simply *did not believe* the prosecution's claim that new fingerprint evidence . . . was a significant change in the state of the evidence. (*Id.* at pp. 780-781.)"

Here, the trial court stated, "the People's justification for delay . . . mirrors that which the *Boysen* court discarded." As in *Boysen*, the trial court did not believe the prosecutor's claim. The court made factual findings, based on the expert testimony, that the DNA evidence was weak from a scientific standpoint, and did not conclusively tie McInnis to the crime. Accordingly, it concluded that it did "not markedly alter the balance of the evidence." This is no different than the court's conclusion in *Boysen*. To the extent the majority claims that it is, I fear trial courts will have difficulty deciphering the line between permissible consideration of the prosecutor's claims and impermissible second-guessing. I cannot discern it.

### *Bracamontes* and *Cowan* Are Distinguishable

The majority compares this case instead to *People v. Bracamontes* (2022) 12 Cal.5th 977 (*Bracamontes*) and *Cowan, supra,* 50 Cal.4th 401, two death penalty cases in which the California Supreme Court affirmed orders *denying* the defendants' motions to dismiss based on precharging delay. It asserts this case is "analytically indistinguishable," and that none of the facts "deviate in a material way." I disagree.

Like *Nelson*, the "break" in the *Bracamontes* case was a strong match to DNA samples taken directly from the victim's body. (*Bracamontes, supra,* 12 Cal.5th at pp. 984, 987.) Also as in *Nelson*, Bracamontes asserted evidence of sperm on the victim's clothing, leading to further DNA testing, could have been detected sooner. (*Id.* at p. 988.) The court rejected this argument, explaining that, given the technology available at the time, the medical examiner's conclusion that there had not been a sexual assault was reasonable. (*Id.* at p. 989.) The court also explained that "[i]t was later discovered" that the method the lab originally used was less effective than a

newer method used when swabs from the victim were reexamined in 2003. (*Id.* at p. 987.)

The majority claims the new testing was done using an "alternate light source" that "was available at the time of the investigation." The *Bracamontes* court noted that an alternate light source revealed biological matter on the victim's pajamas, but it did not comment on when it became available. Instead, the court focused primarily on a change in technique related to swabs taken from the victim's body. (*Bracamontes, supra,* 12 Cal.5th at p. 987 [recounting expert testimony about new extraction methods and changes to DNA testing].) These new techniques allowed the lab to identify "sperm on swabs from the victim" and the resulting DNA conclusively linked Bracamontes to the murder for the first time. (*Id.* at pp. 987–988.) Like in *Nelson*, the prosecution proceeded promptly once the forensic technology established Bracamontes' guilt; thus, the delay was investigative *only* and the justification was strong. (*Ibid.*)

*Cowan* is not a DNA case. Rather, the "break" there occurred when latent fingerprints lifted from the crime scene were reexamined. An analysis conducted just after the murders indicated the prints were *not* a match to Cowan, seemingly absolving him. (*Cowan, supra,* 50 Cal.4th at p. 428.) But the fingerprint technician's work was subsequently called into question. When a patrolman who had worked the case was promoted to detective, he asked to reopen the case and recompare the fingerprints. A positive match conclusively placed Cowan at the scene of the murder. (*Id.* at pp. 420, 428−429.)

In asserting that there were no changed circumstances, the majority overlooks these facts. The court could easily infer that the detective, who was familiar with the evidence in the case, sought to reopen it for the very

24

purpose of reexamining the fingerprints given the known issues with the technician's work. (*Cowan, supra,* 50 Cal.4th at p. 420.) Once that was done, the People had conclusive evidence that Cowan was at the crime scene. The court determined the delay was caused by "an inadvertent failure to detect a *critical* fingerprint analysis." (*Id.* at p. 429, italics added.) Thus, like *Nelson* and *Bracamontes*, it was " 'investigative only, nothing else.' " (*Cowan,* at p. 431.)

This case deviates in material ways from *Bracamontes* and *Cowan.* First, as previously noted, the procedural posture here is reversed, and we must defer to the trial court's *grant* of the motion to dismiss, absent an abuse of discretion. More importantly, here, the trial court made a factual finding, which we likewise must accept, that the new evidence was not "critical" or conclusive; rather, the car seat cover result that allegedly justified the charges was of minimal probative value. And, as discussed, the court made that finding in the context of a case where previously strong circumstantial evidence pointed to a single suspect, and no real evidence explained why the case sat stagnant for more than 22 years. The case was eventually reopened when Bost asked Johnson to look into it, not because there was some known issue with the prior analysis, or because it came up in regular review of cold cases, or because the department received additional resources.

All these circumstances are relevant to the trial court's decision. As the United States Supreme Court stated in *Marion*, accommodating "the sound administration of justice to the rights of the defendant to a fair trial *will necessarily involve a delicate judgment based on the circumstances of each case.*" (*Marion, supra,* 404 U.S. at p. 325, italics added.) In my view, the trial court should be permitted to exercise its judgment based on the entire record before it. The court should not be limited by a rigid test in which review is

25

essentially foreclosed once the prosecutor points to some scintilla of new evidence and baldly asserts it justified charging the case.

**Conclusion**

To paraphrase the legal principles set out in *Nelson* and its progeny, courts should not second-guess the prosecutor's prior decision *not* to charge a case, nor should they second-guess the speed at which the state is able to obtain additional evidence, where there is direct evidence that any delay was related to the state's allocation of limited resources. However, when a prosecutor does decide to charge a case, many years later (decades perhaps), after evidence valuable to the defense had been eroded or lost entirely, the court is not precluded from considering the length and circumstances of the *intervening* delay or the veracity of the prosecutor's assertion that the current charging decision is based solely on new evidence.

I believe courts can and should consider the totality of circumstances when determining the weight of the justification and should not be confined by strict categories. I do not quibble with the conclusion in prior cases that "[t]he justification for the delay is strong when there is 'investigative delay, [and] nothing else.' " (*Cowan*, *supra*, 50 Cal.4th at p. 431; *Nelson, supra,* 43 Cal.4th at p. 1256.) In my view, the trial court here simply determined that the delay was *not* investigative *and* "*nothing else.*" Reading the trial court's decision in its entirety, it is apparent that the crux of that decision was the court's conclusion that the "new" evidence was not particularly probative and the lengthy period of delay was not sufficiently explained. Substantial evidence supports that conclusion and, as a result, the justification falls on a continuum somewhere between purposeful and purely investigative. Accordingly, in my view, the justification is not as strong as it was in *Nelson*, but is entitled to *some* weight, and, on remand, McInnis would

26

need to show that it is outweighed by the resulting prejudice. (See *Nelson*, 43 Cal.4th at p. 1256.)

I do not dispute the majority's assertion that there is good reason for the courts to defer to a prosecutor's decision as to when to bring charges. However, when the prosecutor does bring charges after a lengthy delay, the courts must also consider the important principles of due process and the ability of the defendant to receive a fair trial. Given these competing interests, I do not believe that deference to the prosecutor should preclude all scrutiny of the assertions regarding the charging decision.

Finally, practically speaking, if the trial court cannot assess the veracity of the prosecutor's assertions without improperly second-guessing them, then what is the purpose of holding an evidentiary hearing? If the trial court cannot examine the strength of the "new" evidence, how can the court distinguish a case in which the charging decision is truly the result of obtaining sufficient evidence to justify bringing charges, from a case that the prosecutor places on the "back burner," hoping it will "simmer into something more prosecutable," and then finds some piece of "new" evidence to justify bringing charges at some point down the road? (See *People v. Pellegrino* (1978) 86 Cal.App.3d 776, 781.)

Here, the trial court conducted a thorough evidentiary hearing, analyzed the relevant precedent, made detailed factual findings, and concluded that the explanation offered by the prosecution did not justify the lengthy delay and did not outweigh the prejudice that McInnis would suffer from the prosecution. I would affirm. To the extent the matter must be remanded based on the majority opinion, I believe the trial court should be permitted to conduct a full balancing analysis.

KELETY, J.

27